EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Zoraida Buxó Santiago<br><br>Peticionaria<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Luis A. Pérez Vargas en su carácter oficial como Director de la Oficina de Ética Gubernamental<br><br>Recurridos | Apelación<br><br>2024 TSPR 130<br><br>215 DPR ___ |

Número del Caso: CC-2023-0543

Fecha: 10 de diciembre de 2024

Tribunal de Apelaciones:

Panel V

Representante legal de la parte peticionaria:

Por Derecho Propio

Representante legal de la parte recurrida:

Lcdo. Carlos J. Torres-Vélez

Oficina del Procurador General:

Hon. Fernando Figueroa Santiago
Procurador General

Lcdo. Omar Andino Figueroa
Subprocurador General

Lcda. Amir Cristina Nieves Villegas
Procuradora General Auxiliar

Materia: Ley Orgánica de la Oficina de Ética Gubernamental – El Art. 5.1 provee un listado taxativo de los servidores públicos que deben presentar los informes financieros, el cual no incluye a los Delegados Congresionales.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Zoraida Buxó Santiago<br><br>Peticionaria<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Luis A. Pérez Vargas en su carácter oficial como Director de la Oficina de Ética Gubernamental<br><br>Recurridos | CC-2023-0543 | |

**El Juez Asociado señor Rivera García emitió la Opinión del Tribunal**

En San Juan, Puerto Rico, a 10 de diciembre de 2024.

La controversia que hoy resolvemos exige que definamos los contornos de la autoridad que tiene el Director de la Oficina de Ética Gubernamental (OEG o recurrida) para exigir a ciertos funcionarios públicos la presentación de informes financieros en virtud de las disposiciones de la Ley Orgánica de la Oficina de Ética Gubernamental (LOOEG), *infra*. En particular, debemos contestar si el Art. 5.1 de esta Ley sujeta a los Delegados Congresionales, electos bajo las disposiciones de la Ley para Crear la Delegación Congresional de Puerto Rico, *infra*, a la obligación de presentar estas divulgaciones.

Por los fundamentos que expondremos a continuación, resolvemos que el Art. 5.1 de la LOOEG, *infra*, provee un **listado taxativo** de los servidores públicos que deben rendir los informes financieros allí contemplados.

Además, concluimos que este listado no incluye a los Delegados Congresionales. Consecuentemente, la OEG no posee autoridad expresa o implícita para extender su jurisdicción allí donde no la posee.

Cónsono con lo anterior, resolvemos que la Lcda. Zoraida Buxó Santiago (licenciada Buxó Santiago o peticionaria) actuó correctamente al impugnar el requerimiento que le hizo la OEG ante el Tribunal de Primera Instancia mediante el recurso extraordinario del *injunction* y una solicitud de sentencia declaratoria. Ante una actuación *ultra vires* de la recurrida, carecía de todo sentido exigirle a la peticionaria que agotara un procedimiento administrativo ordinario que **no era adecuado** para atender su planteamiento con prontitud.

Finalmente, en atención a que las repercusiones de este caso se extienden más allá de la solicitud de cierta información financiera que aquí nos ocupa, y que pudiesen redundar en diversas consecuencias colaterales, incluso de naturaleza penal, advertimos que **este recurso no se encontraba en peligro de advenir académico** por el mero hecho que el mandato de los Delegados Congresionales culmine este próximo 31 de diciembre de 2024.

## I

Este recurso tiene su origen en una *Petición urgente de Entredicho Provisional, Interdicto Preliminar y Permanente y/o Sentencia Declaratoria*, presentada por la licenciada Buxó Santiago ante el Tribunal de Primera

Instancia contra el Gobierno de Puerto Rico y el Sr. Luis A. Pérez Vargas, en su capacidad como Director Ejecutivo de la OEG. Según expuso la peticionaria, el 16 de mayo de 2021 esta fue electa Delegada Congresional al Senado de los Estados Unidos en virtud de las disposiciones de la Ley para Crear la Delegación Congresional de Puerto Rico, *infra*.[1]

Dos días más tarde, el 18 de mayo de 2021, el Director Ejecutivo de la OEG emitió un comunicado de prensa en el que afirmó que su agencia tenía plena jurisdicción sobre los Delegados Congresionales por cuanto intervienen en la formulación e implantación de la política pública.[2] Posteriormente, se le requirió a la peticionaria que presentara un informe de toma de posesión, conteniendo cierta información financiera. Esto, amparado en el Art. 5.2 de la LOOEG, *infra*.[3]

Así las cosas, la peticionaria rindió el informe solicitado y posteriormente, rindió el informe financiero anual correspondiente al 2021, allá para el 25 de mayo de 2022.[4] Sin embargo, expuso que el 12 de diciembre de 2022 recibió una comunicación de parte del Área de Auditoria de Informes Financieros de la OEG requiriendo información

---

[1] *Petición urgente de Entredicho Provisional, Interdicto Preliminar y Permanente y/o Sentencia Declaratoria*, Apéndice del *Certiorari*, pág. 5.
[2] *Íd.*
[3] *Íd.*
[4] *Íd.*

que a su vez surgía de transacciones contenidas en su informe del 2021.[5]

En ese contexto, la peticionaria afirma que revisitó las disposiciones de la LOOEG y determinó que no le es de aplicación el requisito de rendir informes financieros, por lo cual tal pretensión de la OEG constituía una actuación *ultra vires*.[6] No obstante, tras exponer su posición, el 20 de enero de 2023 el Director de la OEG le advirtió que, de no cumplir con lo requerido, sería referida a la División de Incumplimientos lo que la exponía a daños concretos e inminentes como la imposición de multas, procesamientos por delitos graves y consecuencias disciplinarias en su carácter como integrante de la profesion legal.[7]

Así las cosas, el foro primario denegó la solicitud de entredicho provisional y turnó el proceso a los restantes trámites extraordinarios. En lo que nos concierne, el Estado presentó una *Moción de desestimación* amparado únicamente en la autonomía jurídica de la OEG y ausencia de alegaciones concretas contra el Gobierno de Puerto Rico.[8]

A su vez, la OEG presentó una *Moción de desestimación* y expuso que el requerimiento de informes financieros a los Delegados Congresionales era cónsono

---

[5] *Íd.*, págs. 5-6.
[6] *Íd.*, pág. 6.
[7] *Íd.*, pág. 8.
[8] *Moción de desestimación*, Apéndice del *Certiorari*, pág. 59.

con el principio cardinal de la OEG de proscribir acciones improcedentes que ponen en riesgo la estabilidad del soporte moral del Estado.[9] Afirmó que la OEG y su dirección ejecutiva tienen facultad de interpretar, aplicar y hacer cumplir las disposiciones de la LOOEG, incluyendo la presentación de informes financieros.[10]

En ese sentido, opinó que el Art. 5.1 de la LOOEG, *infra*, provee para que el Director Ejecutivo pueda modificar o eximir de la presentación de un informe financiero por justa causa.[11] Por ende, a tenor con la interpretación estatutaria que hizo la OEG, los Delegados Congresionales "al igual que otros servidores públicos electos a tiempo completo, que devengan salarios sufragados con fondos públicos, están obligados a presentar informes financieros ante la OEG conforme el Artículo 5.1, *supra*".[12]

Tras estos argumentos, la OEG concluyó que la peticionaria carecía de legitimación activa por falta de un daño toda vez que solo fue apercibida de las consecuencias de su incumplimiento.[13] A su vez, razonó que los remedios solicitados requerirían una intervención a destiempo del tribunal.[14]

---

[9] *Moción de desestimación, Apéndice del Certiorari, pág. 81.*
[10] *Íd., pág. 89.*
[11] *Íd., pág. 94.*
[12] *Íd.*
[13] *Íd., pág. 95.*
[14] *Íd., pág. 96.*

Posteriormente, las partes presentaron la prueba documental que entendían el tribunal debía examinar previo a la vista sobre injunction. Con el beneficio de la prueba y la comparecencia de las partes en una vista celebrada el 15 de febrero de 2023, el Tribunal de Primera Instancia dictó *Sentencia* y declaró sin lugar la petición presentada por la licenciada Buxó Santiago. A su entender,

> al examinar detenidamente este asunto y los argumentos de ambas partes, somos del criterio que existe una controversia genuina de derecho con respecto al alcance del referido Artículo 5.1 de la Ley de Ética Gubernamental. Consecuentemente, no es posible concluir en estos momentos que estamos ante un 'caso claro' de falta de jurisdicción de la OEG para atender el asunto, por lo que tampoco procede aplicar la referida excepción con el propósito de preterir los procedimientos administrativos en curso.[15]

Además, expresó que el significado de la facultad del Director Ejecutivo para modificar la presentación de un informe financiero por justa causa no surge con precisión del texto legal "por lo que estamos ante un escenario hermenéutico de ambigüedad en el texto de la ley".[16] Al estimar que el ejercicio hermenéutico sería "a todas luces complejo", reiteró la ausencia de un caso claro de ausencia de jurisdicción.[17]

Por otra parte, el foro primario concluyó que los daños alegados por la peticionaria son esencialmente

---

[15] *Sentencia* del 22 de febrero de 2023, Apéndice del *Certiorari*, págs. 681-82.
[16] *Íd.*, pág. 683.
[17] *Íd.*, pág. 685.

socioeconómicos y cuasi penales, que no han ocurrido, aunque se expone a sufrirlos en un futuro inminente.[18] Ante ello, hizo referencia a modo persuasivo a la *Sentencia* que emitimos recientemente en <u>Moreno Ferrer v. Junta Reglamentadora del Cannabis Medicinal</u>, *infra*, como un ejemplo de **daños reputacionales** que no constituían el daño irreparable que ameritara desviar el cauce administrativo.[19]

Inconforme con este resultado, la peticionaria solicitó reconsideración y determinaciones adicionales de hechos, lo que fue denegado por el foro primario. Así las cosas, recurrió al Tribunal de Apelaciones el cual, tras atender el asunto, dictó *Sentencia* confirmando al Tribunal de Primera Instancia.

El foro intermedio concurrió con el primario al concluir que las alegaciones de la peticionaria "son insuficientes para la concesión del remedio extraordinario que solicita".[20] Esto daños no habían ocurrido y eran "meras suposiciones hipotéticas sin prueba que las sustenten".[21]

Además, razonó que, pese a que el asunto era de estricto derecho, existen controversias de este tipo en las que conviene que las agencias evalúen el derecho aplicable conforme a su conocimiento especializado en los

---

[18] *Íd.*, pág. 686.
[19] *Íd.*, pág. 687.
[20] *Sentencia* del 31 de mayo de 2023, Apéndice del *Certiorari*, pág. 861.
[21] *Íd.*

asunto fácticos y jurídicos.[22] Por ello, concluyó que era la OEG quien tenía ese conocimiento especializado para atender lo planteado y adoptar las medidas correspondientes en conformidad con su política pública.[23]

Inconforme aún, la peticionaria solicitó reconsideración sin éxito y acudió ante nos mediante petición de *Certiorari*. Le imputó al Tribunal de Apelaciones la comisión de los errores siguientes:

> PRIMER ERROR: Cometió error el TA al no realizar un análisis hermenéutico conclusivo de la LOOEG y su historial y, como consecuencia, requerir a la peticionaria presentar informes financieros y someterla a un procedimiento administrativo sin tener jurisdicción para ello.
>
> SEGUNDO ERROR: Cometió error el TA al no aplicar el precedente de *Yiyi Motors* a propósito de dar curso al *injunction* y la solicitud de sentencia declaratoria.
>
> TERCER ERROR: Cometió error el TA al avalar mediante su *Sentencia* el que el Director de la OEG, como un funcionario de la Rama Ejecutiva, usurpe la función legislativa en violación del principio de separación de poderes, bajo el palio de que ejerce la función de interpretar la ley.

Atendido el recurso, el 26 de enero de 2024 expedimos en reconsideración.

Oportunamente, recibimos la comparecencia de las partes, donde ambas reprodujeron, en esencia, los mismos argumentos que presentaron ante los foros inferiores. A su vez, el Gobierno de Puerto Rico presentó una *Comparecencia del Estado y solicitud de relevo de Orden*.

---

[22] *Íd.*, pág. 862.
[23] *Íd.*, pág. 863.

Allí argumentó, una vez más su posición, sobre la carencia de alegaciones contra el Estado y la personalidad jurídica de la OEG. Examinado el asunto, declaramos con lugar su solicitud y relevamos al Estado de cualquier trámite ulterior en este recurso.

Trabado así el asunto, procedemos a resolver.

## II

### A. Delegación de facultades a las agencias administrativas

Incidental a la importante función que desempeñan las agencias administrativas en nuestro sistema gubernamental, hemos reconocido ciertas pautas sobre el poder que estas ostentan y sus límites. En principio, es la ley "el medio o fuente legal que establece los límites del poder y de las facultades de las agencias administrativas".[24] De ahí que estas instrumentalidades públicas operan bajo una delegación de poderes procedente de principios inteligibles que no le conceden más autoridad que la necesaria para implementar las leyes que administran.[25] Es en virtud de esos principios inteligibles que "las agencias administrativas canalizan la autoridad y discreción que la ley les confiere".[26]

Cónsono con lo anterior, la jurisdicción o poder decisorio que puedan tener las agencias administrativas queda estrictamente delimitada por "los poderes que

---

[24] Yiyi Motors, Inc. v. ELA, 177 DPR 230, 247 (2009).
[25] Sánchez v. Departamento de Vivienda, 184 DPR 95, 119 (2011).
[26] Íd.

específicamente la Asamblea Legislativa le haya conferido en su ley habilitadora".[27] Sencillamente, **un organismo administrativo no puede asumir jurisdicción sobre un asunto a menos que esté claramente autorizado en ley para ello**.[28] Se trata pues de ejecutar únicamente (1) aquellas funciones que se le encomendaron legislativamente, (2) aquellas que surgen de su actividad o encomienda principal y (3) en el ejercicio de los poderes indispensables para llevar a cargo sus deberes y responsabilidades.[29]

Por estos motivos, reiteradamente hemos enfatizado que **ni la necesidad, ni la utilidad, ni la conveniencia pueden sustituir la ley como fuente de jurisdicción de una agencia**.[30] Como consecuencia, "cualquier duda en cuanto a la existencia de dicho poder debe resolverse en contra de su ejercicio".[31] De exceder los poderes que la Asamblea Legislativa le delegó, la agencia habría actuado de forma *ultra vires* y por ende todas sus ejecutorias serán nulas en derecho.[32]

**B. Interpretación por las agencias de las leyes que administran**

El ejercicio de una facultad ejecutiva o adjudicativa presupone necesariamente la interpretación

---

[27] OCS v. CODEPOLA, 202 DPR 842, 852 (2019).
[28] *Íd.*
[29] *Íd.*
[30] Yiyi Motors v. ELA, *supra*, pág. 247.
[31] *Íd.*
[32] *Íd.*

de aquellas normas que invisten al facultado para así actuar. En ese sentido, somos conscientes que las agencias administrativas vienen llamadas en muchas ocasiones a ser los primeros intérpretes de las leyes que rigen el ejercicio de su ministerio.

En atención a esta realidad, hemos reconocido que los tribunales apelativos deben conceder gran deferencia a las decisiones emitidas por las agencias administrativas debido a la vasta experiencia y conocimiento especializado que les han sido encomendados.[33] Como parte de la revisión de las conclusiones jurídicas que haga una agencia, hemos enfatizado que estas no deben ser descartadas libremente ni sustituidas por el criterio propio de los tribunales.[34] En muchos casos, "el conocimiento especializado de la agencia es pieza fundamental".[35]

Sin embargo, es igualmente cierto que la tradicional deferencia cede cuando la actuación administrativa resulta irrazonable o ilegal "y ante interpretaciones administrativas que conduzcan a la comisión de injusticias".[36] Además, **esa deferencia tampoco prevalecerá cuando la interpretación de la agencia produce resultados incompatibles o contrarios al propósito del estatuto interpretado** y a su política pública.[37]

---

[33] Asoc. FCIAS v. Caribe Specialty II, 179 DPR 923, 940 (2010).
[34] Íd., pág. 941.
[35] Íd.
[36] Íd.
[37] Íd., págs. 941-42.

Después de todo, las normas de interpretación, incluyendo la acostumbrada deferencia al peritaje administrativo, constituyen hermenéutica que en ningún modo afecta el alcance de la facultad revisora de los tribunales.[38] **Es "a los tribunales y no a los organismos administrativos a quienes compete interpretar las leyes y la Constitución".**[39] (Negrillas suplidas).

Mediante el ejercicio interpretativo o de hermenéutica legal descubrimos cuál ha sido la voluntad de nuestra Asamblea Legislativa.[40] Cónsono con ello y como norma general, damos cumplimiento a nuestro Código Civil que advierte que "[c]uando la ley es clara y libre de toda ambigüedad, **su texto no debe menospreciarse bajo el pretexto de cumplir su espíritu".**[41] (Negrillas suplidas).

De ahí que resulta imprescindible reconocer que ante la falta de ambigüedad en la ley **"no hay necesidad de indagar más allá de ella como subterfugio para cumplir con el propósito legislativo".**[42] (Negrillas suplidas). Naturalmente, cuando exista verdadera ambigüedad, "este Tribunal rechazará una interpretación literal y forzada de un texto legal que produzca un resultado que no puede haber sido el que intentó el legislador".[43]

**C. Pretirición del trámite administrativo por falta de jurisdicción**

---

[38] OEG v. Rodríguez y otros, 159 DPR 98, 124 (2003).
[39] Íd.
[40] Asoc. FCIAS v. Caribe Specialty II, *supra*, pág. 938.
[41] Art. 19 del Código Civil de 2020, 31 LPRA sec. 5341.
[42] Asoc. FCIAS v. Caribe Specialty II, *supra*, pág. 938.
[43] Íd., pág. 939.

Por otro lado, nuestro sistema procesal reconoce la revisión judicial como remedio disponible para quienes se encuentren inconformes con una determinación administrativa. No obstante, es harto conocido que la regla general en esta materia es que solo las órdenes o resoluciones finales de una agencia son susceptibles de ser revisadas por los tribunales.[44] Otro nombre por el cual conocemos esta norma es la doctrina de agotamiento de remedios administrativos.

Bajo este precepto, "una parte que desea obtener un remedio en una agencia debe utilizar todos los medios administrativos disponibles antes de acudir a un tribunal. Esto implica que la revisión judicial no está disponible hasta tanto la parte afectada haya utilizado todos los procedimientos correctivos ofrecidos por el procedimiento administrativo".[45] Destacamos, además, que esta doctrina facilita la revisión judicial, ya que asegura que los tribunales tengan información más precisa sobre el asunto en controversia y les permite tomar una decisión más informada.[46]

Ahora bien, esta normativa no constituye una camisa de fuerza que no permita atender situaciones excepcionales. Por ello, tanto la jurisprudencia y la legislación han afirmado que existen circunstancias que

---

[44] Esta norma fue recogida en la Sec. 4.2 de la Ley Núm. 38-2017, Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, 3 LPRA sec. 9672.

[45] AAA v. UIA, 200 DPR 903, 913 (2018).

[46] Íd.

ameritan preterir el trámite administrativo y proceder directamente a la revisión judicial.

Concretamente, la Sec. 4.3 recoge varias causales mediante las cuales se puede solicitar la atención directa del tribunal, por lo que citamos *in extenso*:

> El tribunal podrá relevar a un peticionario de tener que agotar **alguno o todos los remedios administrativos provistos en el caso de que dicho remedio sea inadecuado**, o cuando el requerir su agotamiento resultare en un **daño irreparable** al promovente y en el balance de intereses no se justifica agotar dichos remedios, o cuando se alegue la violación sustancial de derechos constitucionales, o cuando sea inútil agotar los remedios administrativos por la dilación excesiva en los procedimientos, o cuando sea un **caso claro de falta de jurisdicción de la agencia**, o cuando sea un **asunto estrictamente de derecho** y es innecesaria la pericia administrativa.[47] (Negrillas suplidas).

En lo que aquí nos interesa, "en múltiples ocasiones este Tribunal ha reconocido como excepción a la norma de finalidad una situación de clara falta de **jurisdicción** de la agencia administrativa".[48] (Negrillas en el original). Así, un tribunal puede preterir el trámite administrativo cuando se impugne la jurisdicción de la agencia y la ausencia de esta se deduce claramente de las alegaciones.[49] En ese sentido, cuando se determina que la agencia carece de jurisdicción estamos ante un proceso administrativo que realmente advino final, pues no hay

---

[47] Sec. 4.3 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, 3 LPRA sec. 9673.

[48] AAA v. UIA, supra, pág. 915.

[49] *Íd.*, pág. 916.

nada adicional susceptible de ser resuelto por la agencia.[50]

Advertimos, que nuestra casuística tradicionalmente le ha reconocido a las agencias la potestad de hacer una determinación inicial sobre su jurisdicción. Sin embargo, en caso de una clara falta de jurisdicción "el asunto es enteramente de la competencia judicial".[51] En auxilio de ese análisis, hemos indicado que los tribunales deben evaluar los siguientes factores para dilucidar un planteamiento jurisdiccional: (1) el riesgo que se ocasione un daño irreparable si el tribunal pospone su intervención, (2) el grado de claridad con el que surja la carencia de jurisdicción y (3) la pericia de la agencia al atender cuestiones jurisdiccionales.[52]

### D. Injunction y sentencia declaratoria como mecanismo para plantear la falta de jurisdicción de una agencia

En esa misma línea, debemos considerar cuál sería el mecanismo procesal que mejor pudiera convidar el reclamo de la persona agraviada. Dado que en el caso de marras la peticionaria intentó obtener el favor del tribunal mediante los remedios del injunction y sentencia declaratoria, conviene repasar la normativa atinente a ambos y su interacción con este recurso.

---

[50] *Íd.*, pág. 917.
[51] *Íd.*
[52] *Íd.* págs. 917-918.

El injunction permanente es una variante del recurso extraordinario del injunction o interdicto. Como es de conocimiento, "el injunction es un mandamiento judicial en virtud del cual se requiere que una persona se abstenga de hacer, o de permitir que se haga, determinada cosa que infrinja o perjudique el derecho de otra".[53] Crucialmente, hemos indicado reiteradamente que la concesión de este remedio presume la inexistencia de un remedio adecuado en ley.[54]

Intrínseca a la naturaleza del injunction es su necesidad como medio para prevenir **perjuicios inminentes o daños irreparables**.[55] Este tipo de acción se dirige contra actos futuros que amenazan ser cometidos o que se anticipa que serán cometidos.[56] Importantemente, "hay que detectar si la acción connota o no un agravio de patente intensidad al derecho del individuo que reclame una reparación urgente".[57] Es irreparable el daño "que no puede ser satisfecho adecuadamente mediante la utilización de los remedios legales disponibles".[58]

De particular relevancia, merece recordar que "el recurso de *injunction* es el remedio adecuado y disponible para que un ciudadano impida que un funcionario, al poner en vigor una legislación, actúe **contrario a lo dispuesto en ésta o en exceso de la facultad** otorgada por dicho

---

[53] Next Step Medical v. Bromedicon, 190 DPR 474, 485-86 (2014).
[54] *Íd.*, pág. 486.
[55] Mun. de Fajardo v. Srio. de Justicia, 187 DPR 245, 255 (2012).
[56] VDE Corporation v. F & R Contractors, 180 DPR 21, 40 (2010).
[57] *Íd.*
[58] *Íd.*

estatuto".[59] (Negrillas suplidas e itálico en el original). No se trata de expedir el injunction para determinar la constitucionalidad o la validez de la actuación, en realidad se pretende determinar únicamente si la acción está comprendida dentro de la autoridad que le confiere el estatuto a ese actor.[60]

Por su parte, la sentencia declaratoria es "un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un **peligro potencial contra quien la solicita**".[61] (Negrillas suplidas). Su propósito es la disipación de cualquier divergencia de criterio en la interpretación de un estatuto.[62] Según la Regla 59.1 de Procedimiento Civil, este remedio procede "aunque se inste o pueda instarse otro remedio".[63] Particularmente, queda facultado para instar esta acción aquella cuyos derechos, estado u otras relaciones jurídicas fuesen afectadas por un estatuto.[64]

### E. Informes financieros bajo el Art. 5.1 de la Ley Orgánica de la Oficina de Ética Gubernamental

Como máximos garantes del ordenamiento jurídico de Puerto Rico hemos reconocido reiteradamente que la

> Ley de Ética Gubernamental y su Reglamento tienen el propósito principal de que los funcionarios y empleados del servicio público mantengan principios del más alto grado de honestidad, integridad,

---

[59] <u>Yiyi Motors, Inc. v. ELA</u>, *supra*, págs. 280-81.
[60] *Íd*., pág. 281.
[61] <u>Alcalde de Guayama v. ELA</u>, 192 DPR 329, 333 (2015).
[62] *Íd*.
[63] Regla 59.1 de Procedimiento Civil, 32A LPRA Ap. V.
[64] Regla 59.2 de Procedimiento Civil, 32A LPRA Ap. V; <u>Mun. de Fajardo v. Srio. de Justicia</u>, *supra*, pág. 254.

imparcialidad y conducta para garantizar el funcionamiento de las instituciones gubernamentales y conservar la confianza de los ciudadanos en su gobierno.[65]

Esta Ley rige la conducta de los servidores y ex servidores públicos del Poder Ejecutivo.[66] Su objetivo principal es renovar y reafirmar la función preventiva y fiscalizadora de la OEG.[67] En la consecución de estos objetivos, la LOOEG,[68] contiene disposiciones de carácter preventivo y profiláctico que prohíben situaciones con gran potencial de causar efectos negativos a la imagen de integridad de los servidores públicos y de la imparcialidad de los procesos gubernamentales.[69]

Justamente, una de las disposiciones preventivas mejor conocidas de la LOOEG consiste en la obligación que les impone a ciertos servidores públicos de rendir informes financieros iniciales y luego anuales a la OEG. Dicha obligación queda recogida en el Capítulo V de la LOOEG.[70]

Según describe el Art. 5.4, el informe financiero a ser sometido incluye una cantidad sustancial de información personal, incluyendo entre otros: (1) nombres y direcciones personales y de negocios; (2) ingresos e intereses del servidor y su unidad familiar; (3) activos valorados sobre $1,000.00, incluyendo cuentas bancarias, mobiliario, pólizas de seguro, objetos de arte y

---

[65] OEG v. Concepción Bonilla, 183 DPR 695 (2011).
[66] OEG v. Martínez Giraud, 210 DPR 79, 91 (2022).
[67] Íd.
[68] Ley Núm. 1-2012, 3 LPRA sec. 1854 et seq.
[69] OEG v. Rodríguez y otros, supra, pág. 123.
[70] Artículos 5.1-5.10 de la LOOEG, 3 LPRA secs. 1858-1858i.

participaciones en empresas o negocios; (4) pasivos, incluyendo deudas de sobre $1,000.00 y (5) otras transacciones financieras tales como compras o ventas de inmuebles o muebles, regalos y donaciones en exceso de $250.00 y otra información que a juicio del informante sea pertinente incluir.[71]

Por otra parte, el Art. 5.2 de la LOOEG dispone que aquellos servidores públicos de los Poderes Ejecutivos y Legislativos, **obligados a rendir informes financieros**, deben rendir ciertos informes (1) dentro de los noventa días posteriores a asumir el cargo, (2) anualmente no más tarde del primero de mayo del año posterior y (3) dentro de los noventa días posteriores a desvincularse del cargo.[72]

Ahora bien, al recurrir al Art. 5.1 de la LOOEG, encontramos que su título, "Aplicabilidad", nos dirige hacia un listado de servidores públicos a los que "[l]as disposiciones de esta Ley [les] requieren someter informes financieros".[73] Recordemos, que en principio el Art. 1.2 de la LOOEG define a un servidor público en términos amplios como una "persona en el Gobierno que interviene en la formulación e implantación de la política pública o no, aunque desempeñe su encomienda permanente o temporalmente, con o sin remuneración".[74]

---

[71] Art. 5.4 de la LOOEG, 3 LPRA sec. 1858c.
[72] Art. 5.2 de la LOOEG, 3 LPRA sec. 1858a.
[73] Art. 5.1(A) de la LOOEG, 3 LPRA sec. 1858.
[74] Art. 1.2(gg) de la LOOEG, 3 LPRA sec. 1854.

Así las cosas, y refiriéndonos nuevamente al Art. 5.1 de la LOOEG, *supra*, este nos indica que el requisito de someter informes financieros aplica a los **"siguientes"** servidores públicos. Veamos en detalle.

De entrada, los enumerados 1-13 del inciso A) del Art. 5.1 contienen expresamente los títulos de varios funcionarios sujetos a este requisito.[75] Entre estos, el Gobernador de Puerto Rico, los miembros de la Asamblea Legislativa y los integrantes del Poder Judicial.[76] Sin embargo, resulta de interés el lenguaje que utiliza el enumerado 14, pues allí no se nombran puestos concretos, sino más bien se describen ciertas funciones dentro del aparato gubernamental.[77] Y es que el texto va más allá, pues se impone el requisito de rendir informes financieros a quienes ejecuten estas actividades como su **"función principal"**.[78]

Nuevamente, por la extrema pertinencia de las funciones descritas, reproducimos esta parte de la ley íntegramente:

> a) Los que toman la determinación final de expedir, enmendar, paralizar o cancelar permisos, licencias, certificaciones, exenciones, acreditaciones, consultas o los endosos requeridos para: 1) la operación de un establecimiento; 2) realizar mejoras a terrenos u obras; 3) lotificar o desarrollar una propiedad; 4) construir una estructura o parte de ésta; 5) utilizar una propiedad mueble o inmueble para un uso en específico;

---

[75] Art. 5.1(A) de la LOOEG, 3 LPRA sec. 1858.
[76] *Íd.*
[77] *Íd.*
[78] *Íd.*

b) los que toman la determinación final sobre una consulta de uso de terrenos;

c) los que toman la determinación final de multar a personas o a entidades que dependen o requieren de permisos, licencias, certificaciones, exenciones, acreditaciones, consultas o endosos expedidos por su agencia para la operación de un establecimiento, mejoras a terrenos u obras, lotificación o desarrollo de una propiedad, construcción de una estructura o de parte de ésta, o para la utilización de una propiedad mueble o inmueble para un uso específico;

d) los que otorgan contratos de todo tipo, incluyendo las órdenes de compra y de servicios;

e) los que toman la determinación de transar o de llegar a un acuerdo sobre deudas entre personas privadas y cualquier organismo del Gobierno;

f) los que toman la determinación final de transar o de llegar a un acuerdo en alguna acción presentada ante los tribunales o ante un organismo cuasi judicial;

g) los que dirigen el área encargada de administrar los recursos financieros y el presupuesto, elaborar estados o informes financieros y verificar el cumplimiento de la política pública de administración de su agencia;

h) los que dirigen el área encargada del estudio, adquisición del equipo, diseño, desarrollo, implantación, soporte y dirección de los sistemas de información computarizados de una agencia;

i) los que tienen la facultad final de aprobar préstamos, desembolsos, subsidios o el pago de compensaciones, entre otros, por incapacidad;

j) los que dirigen el área encargada de administrar, asignar, conceder o distribuir fondos federales;

k) los que recaudan, cobran o colectan dinero mediante cualquier método de pago;

l) los que dirigen el área encargada de recibir quejas, planteamientos o querellas y lleven a cabo una investigación o procesamiento;

m) los que dirigen el área encargada del inventario, registro y disposición de la propiedad pública, de otros equipos o de valores en su agencia;

n) los que toman la determinación final sobre la adquisición o disposición de la propiedad inmueble o mueble en cada agencia;

ñ) los que toman la determinación final en los proyectos de obras públicas que realice su agencia;

o) los que tienen la facultad de dirigir una región en su agencia, con autonomía o independencia de criterio para realizar una o varias de las siguientes funciones: la contratación, el desembolso, la distribución, la asignación y el uso de las partidas presupuestarias, la concesión de beneficios, la compra y la venta de activos, y la disposición de propiedad;

p) los que dirigen el área encargada de auditar los informes financieros y las planillas de contribución sobre ingresos rendidos al amparo de la Ley de Ética Gubernamental o del Código de Rentas Internas;

q) los que realizan compras para su agencia.[79]

Así las cosas, el Art. 5.1 de la LOOEG contiene dos incisos adicionales, el B) y el C) que establecen circunstancias que permiten variar la normativa anterior. El inciso B) dispone que el Gobernador de Puerto Rico puede eximir de la obligación de presentar informes financieros a servidores del Poder Ejecutivo que presten servicios *ad honorem* o que solo perciban dietas.[80] A su vez, el inciso C) autoriza al Director de la OEG "para **modificar o eximir** de la presentación de un informe financiero por justa causa".[81] (Negrillas suplidas).

Finalmente, el Art. 5.7 de la LOOEG dispone ciertas penalidades y sanciones a las que se expone un servidor público del Poder Ejecutivo que se aparte de las exigencias de este capítulo de la Ley. De entrada, reconoce que quien "a sabiendas y voluntariamente, falsifique o deje de presentar o de divulgar cualquier

---

[79] *Íd.*
[80] Art. 5.1(B) de la LOOEG, 3 LPRA sec. 1858.
[81] Art. 5.1(C) de la LOOEG, 3 LPRA sec. 1858.

información que sea requerida en el informe financiero, o que sea solicitada por la Oficina durante la auditoría, conforme lo dispuesto en el Artículo 5.4 de esta Ley, será culpable de **delito grave**".[82] (Negrillas suplidas). Tal conducta acarrearía una **pena fija de tres años y una multa de $5,000.00**.[83]

A su vez la OEG puede acudir al foro primario y solicitar un remedio interdictal que impida acciones contrarias a la LOOEG.[84] Además, la persona que se aparte de estas disposiciones se expone a **multas administrativas de hasta $20,000.00** por cada violación.[85] Por último, se faculta a las autoridades nominadoras para imponer las siguientes sanciones: **(1) amonestación escrita, (2) suspensión sumaria del empleo, (3) suspensión de empleo y sueldo y (4) destitución o despido**.[86]

### F. Ley para crear la Delegación Congresional de Puerto Rico

La posición de Delegado Congresional surge en virtud de la Ley para Crear la Delegación Congresional de Puerto Rico.[87] Dicha legislación persigue el propósito de dar cumplimiento al resultado del plebiscito sobre el estatus de Puerto Rico, celebrado el pasado 3 de noviembre de 2020.[88] En particular, proveyó para la integración de una Delegación Congresional compuesta por dos senadores y

---

[82] Art. 5.7(a) de la LOOEG, 3 LPRA sec. 1858f.
[83] *Íd.*
[84] Art. 5.7(b) de la LOOEG, 3 LPRA sec. 1858f.
[85] Art. 5.7(c) de la LOOEG, 3 LPRA sec. 1858f.
[86] Art. 5.7(d) de la LOOEG, 3 LPRA sec. 1858f.
[87] Ley Núm. 167-2020, 16 LPRA sec. 985 *et seq*.
[88] Art. 2 de la Ley Núm. 167-2020, 16 LPRA sec. 985a.

cuatro representantes, a ser elegidos en una elección especial y quienes deberían iniciar sus funciones el 1 de julio de 2021.[89]

En lo que nos es de particular interés, el Art. 8 de la Ley dispuso los requisitos de los candidatos para ser delegados. Entre estos: (1) ser mayores de edad, (2) dominar el español y el inglés, (3) ser residentes de Puerto Rico o el Distrito de Columbia, (4) acceder bajo juramento a defender el resultado del plebiscito y (5) trabajar a tiempo completo durante su cargo para defender ese fin.[90] El referido articulado reconoció que el incumplimiento con estos deberes sería causa para la descalificación como candidato.[91]

Así las cosas, la Ley también proveyó los deberes que asumirían aquellas personas que fuesen debidamente electos. Concretamente, la legislación reconoce expresamente un solo deber: presentar un informe sobre sus gestiones cada noventa días al Gobernador de Puerto Rico.[92] Por lo demás, la Ley indica que lo relacionado a los gastos y salarios de los Delegados Congresionales serían sufragados por la Administración de Asuntos Federales de Puerto Rico.[93]

**G. Doctrina de academicidad y la excepción por consecuencias colaterales**

---

[89] *Íd.*
[90] Art. 8 de la Ley Núm. 167-2020, 16 LPRA sec. 985g.
[91] *Íd.*
[92] Art. 12 de la Ley Núm. 167-2020, 16 LPRA sec. 985k.
[93] Art. 13 de la Ley Núm. 167-2020, 16 LPRA sec. 985l.

Nuestra doctrina reconoce que la facultad de los tribunales para entender en un pleito solamente debe darse ante la existencia de un caso o controversia. Esto es, "que la jurisdicción de los tribunales está sujeta a que los casos sean justiciables, ya que su función es adjudicar controversias reales y vivas, en las cuales existan partes con intereses encontrados cuyo propósito sea obtener un remedio que tenga un efecto sobre la relación jurídica".[94] De ahí que una de las normas fundamentales de autolimitación indica que los tribunales no deben intervenir ante la presencia de un caso que se ha tornado académico.

Amparados en el precepto de la academicidad, evitamos "el uso inadecuado de los recursos judiciales y [los] precedentes innecesarios".[95] En términos concretos, implica que en el caso particular (1) la controversia en realidad no existe o (2) el derecho que se pretende vindicar no ha sido aún reclamado o (3) la determinación que tomaría el tribunal no tendría efecto práctico sobre las partes.[96] Ello como repercusión de cambios fácticos o judiciales en el trámite que tornan en académico un caso que en su inicio era justiciable.[97]

Con el fin de auscultar la jurisdicción del tribunal, "se deben evaluar **los eventos anteriores,**

---

[94] Véanse, <u>Lozada Tirado v. Testigos de Jehová</u>, 177 DPR 893, 908-09 (2010); <u>ELA v. Aguayo</u>, 80 DPR 552, 584 (1958).

[95] <u>Super Asphalt Pavement, Corp. v. AFIPR</u>, 206 DPR 803, 815-16 (2021).

[96] *Íd.*, pág. 816.

[97] *Íd.*

**próximos y futuros**, antes de determinar si la controversia entre las partes sigue viva y subsiste con el tiempo".[98] (Negrillas suplidas). Por ello, hemos dicho que una de las maneras en las cuales un caso evade la academicidad surge cuando de la controversia mayor emanan consecuencias colaterales que aun pueden tener repercusiones de no adjudicarse el caso. Es decir, que el caso es susceptible de ser resuelto aún "cuando aspectos de la controversia se tornan académicos pero **persisten controversias colaterales de ésta que tienen vigencia y actualidad**".[99] (Negrillas suplidas).

## III

Previo a adentrarnos en los méritos de este recurso debemos dar consideración a una interrogante jurisdiccional que conforme a nuestra doctrina venimos llamados a resolver con preferencia, incluso en ausencia de un planteamiento de parte. En términos parcos, resulta imprescindible determinar si el caso ante nos representa una controversia que está próxima a convertirse en académica por el mero paso del tiempo. Esto pues, como apreciamos en el estudio del derecho atinente, los

---

[98] *Íd.*
[99] CEE v. Depto. de Estado, 134 DPR 927, 936 (1993).

integrantes de la Delegación Congresional cesarán funciones el próximo 31 de diciembre de 2024.[100]

Ante ese escenario, cabe preguntarnos si la salida de la peticionaria de su puesto tornará en académica la controversia entre esta y la OEG. Esto, cuando entre estas partes persiste una dicotomía sobre si la peticionaria debe rendir informes financieros. **Opinamos que no.**

Nótese, que la jurisdicción de la OEG no se limita exclusivamente a personas que mantienen un estatus activo como servidores públicos en el momento en el que se les haga algún señalamiento o requerimiento por parte de esta entidad. Es más, el texto de la LOOEG indica literalmente que el Código de Ética que surge del Capitulo IV del estatuto "reglamenta la conducta de los servidores y ex servidores públicos de la Rama Ejecutiva".[101] Esto los sujeta a la obligación de rendir los informes financieros al entrar en su cargo, anualmente mientras lo retienen y **un informe financiero adicional en o antes de los noventa días posteriores al desvincularse del puesto.**[102]

Además, sabemos cuáles son las consecuencias colaterales de incumplir con estos requisitos, si es que le aplican a la persona. La renuencia a acatar los pedidos de la OEG puede resultar en acciones criminales,

---

[100] Art. 4 de la Ley para Crear la Delegación Congresional de Puerto Rico, 16 LPRA sec. 985c.

[101] Art. 4.1 de la LOOEG, 3 LPRA sec. 1857.

[102] Art. 5.2(d) de la LOOEG, 3 LPRA sec. 1858a.

civiles y administrativas con graves consecuencias para la libertad, sustento y peculio del empleado o ex empleado. Nada en el texto de la LOOEG sugiere que estas secuelas culminan al apartarse el servidor público de su puesto. Por tanto, **resulta forzoso concluir que este no es ni será un caso académico**. Las manifestaciones colaterales que surgen de la interrogante que aquí contestaremos van más allá del informe de la licenciada Buxó Santiago para el 2021.

Resuelto este extremo, debemos atender los señalamientos de error de la peticionaria, los que consideraremos en conjunto. En apretada síntesis, existen dos vertientes a esta controversia: una procesal y otra sustantiva. En principio, debemos concluir si aquí la licenciada Buxó Santiago erró al recurrir al Tribunal de Primera Instancia cuando recibió los requerimientos de información de la OEG que esta objetó. Esto, por entender que la Ley no facultaba a la OEG para exigirle la rendición de informes financieros. Por ello, resolver si la peticionaria debía agotar los procedimientos ante la OEG resulta imposible si no atendemos la sustancia de la controversia sustantiva que esta planteó ante los tribunales. ¿Tienen que rendir los Delegados Congresionales informes financieros a la OEG? Veamos.

Al examinar el texto del Art. 5.1 de la LOOEG, *supra*, no podemos evitar lo que es poco más que obvio. El listado contiene, primeramente, una lista de funcionarios

concretos, con sus títulos claramente identificados, que están sujetos al requisito. La segunda lista, entiéndase el enumerado 14, contiene descripciones de funciones principales de un puesto cuyo ocupante estaría obligado a rendir los informes.

Evidentemente, la posición de Delegado Congresional no se encuentra en el listado. No solamente es que el puesto surge de una ley del 2020 y la LOOEG data del 2012, si bien con enmiendas posteriores, es que como vimos en la Ley para la Delegación Congresional de Puerto Rico, *supra*, el encargo de estos delegados es el adelanto del resultado del pasado plebiscito de estatus del 3 de noviembre de 2020. Por ello, nos parece igualmente evidente que ninguna de las funciones que describe el enumerado 14 se acerca a la labor de estos funcionarios.

Y no podía ser de otra manera, pues un análisis integral e inconfundible nos sugiere que el fin de este artículo es reproducir un **listado taxativo** de aquellas personas cuyas funciones ameritan que estén obligados a rendir informes financieros. Adviértase, que esto no es lo mismo que concluir que una persona que no tenga que rendir informes financieros queda exento de la jurisdicción de la OEG. Una cosa no tiene que ver con la otra. Meramente, el texto sugiere que la rendición de informes financieros es una obligación que afecta a solo algunos servidores públicos, por lo cual nos resulta incomprensible la postura de la OEG en este asunto.

Según nos sugiere esta agencia, la salvedad que hace el Art. 5.1(C) de la LOOEG, *supra*, respecto a la facultad que tiene el Director de la OEG para modificar o eximir de la presentación de informes financieros, constituye una especie de válvula de escape que permite a la agencia añadir otros funcionarios a esa obligación. **Rechazamos totalmente esta interpretación.**

Como vimos, un principio básico de la hermenéutica es que el texto de la ley no se debe menospreciar so pretexto de honrar su espíritu. Igualmente, otro precepto de similar relevancia indica que los tribunales no le tendremos deferencia a las interpretaciones irrazonables que una agencia haga de las leyes que administra.

La OEG, aun con la trascendencia de la función que ejecuta, no tiene poderes irrestrictos para someter a funcionarios públicos al requisito de rendir informes financieros basado en una interpretación estatutaria contraria al sentido literal de la Ley. Mucho menos disfrazar esa atribución de funciones bajo el pretexto de una libertad de interpretación que a todas luces dicta que la OEG es la máxima autoridad sobre el contenido y sentido de su ley orgánica. Sería un evento sin precedentes que este Tribunal le confiriera a la OEG el nivel de deferencia que esta sugiere debemos concederle.

Decir que la facultad que tiene el Director Ejecutivo para modificar o eximir de la presentación de informes financieros equivale a una autoridad para

unilateralmente alterar el listado que la Asamblea Legislativa confeccionó, para añadir personas, resulta en un contrasentido irrazonable y extremadamente acomodaticio. En este punto, los foros inferiores razonaron que existe una verdadera ambigüedad sobre la palabra "modificar" *vis a vis* el listado de funcionarios obligados a rendir informes. No quedamos convencidos.

Reiteramos que la lectura de la lista convida inequívocamente el sentido de que la Asamblea Legislativa deseaba restringir la facultad del Director Ejecutivo en esta área. Tan es así, que sabemos que la versión anterior de esta ley orgánica, la derogada Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico de 1985,[103] expresamente reconocía la facultad del Director Ejecutivo para imponer el requisito de rendición de informes a "[c]ualquier otro cargo o puesto, incluyendo pero no limitado al cargo de secretario auxiliar, director de negociado o jefe de oficina, cuya inclusión sea recomendada por el jefe de la agencia y ordenada por el Director de la Oficina".[104]

Nos sugiere la OEG que este cambio no debe conducir a la conclusión de que la exclusión de esta disposición restringió la autoridad del Director Ejecutivo. Declinamos adoptar tal pretensión. La única lectura

---

[103] Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico de 1985, Ley Núm. 12 de 24 de julio de 1985, 3 LPRA sec. 1801 *et seq*. (Derogada).

[104] Art. 4.1(a)(10) de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico de 1985, 3 LPRA sec. 1831. (Derogado).

razonable del lenguaje actual es que la facultad para modificar los requisitos o eximir de ellos aprovecha únicamente a los funcionarios **de otro modo obligados a rendir informes financieros**. Nada más.

Además, no pasamos por alto que las expresiones iniciales de la OEG, producidas como resultado de un comunicado de prensa por parte de su Director Ejecutivo, intiman que la presunta participación de los Delegados Congresionales en la formulación o implantación de la política pública los sujeta a la jurisdicción de la OEG en lo relativo al rendimiento de informes financieros. Tampoco quedamos convencidos.

Bajo el marco conceptual de la LOOEG, una cosa es que la persona sea un servidor público para los fines de la Ley. Muy distinto es que ese servidor público venga llamado a rendir informes financieros. Para ello, como indicamos, es imprescindible que su función aparezca de algún modo en el listado del Artículo 5.4 de la LOOEG, *supra*.[105]

En suma, la postura de la OEG puede reducirse a la creencia de que el privilegio que tiene para interpretar la LOOEG le confiere la autoridad para atribuirse poderes que la Asamblea Legislativa no le dio. Difícilmente

---

[105] No pasamos por alto que la ausencia de los Delegados Congresionales resultó tan evidente que hasta llegó a proponerse un proyecto de ley con el fin de incluirlos en el listado, aunque dicho proyecto no prosperó. Véase, P. de la C. 807, 19na Asamblea Legislativa, 1ra Sesión Ordinaria, 18 de mayo de 2021.

pudiéramos contemplar un ejemplo más claro de una interpretación administrativa completamente irrazonable.

Establecido lo anterior, concluimos que aquí hay un caso claro de falta de jurisdicción de la agencia. La OEG no está facultada para exigirle a los Delegados Congresionales que rindan informes financieros. Siendo así, poco sentido tendría que la peticionaria dedicara una cantidad extendida de tiempo a litigar este tema ante la OEG. No hay remedios adecuados que agotar pues evidentemente la agencia no tiene autoridad para exigir la información solicitada y nada abonaría atrasar esa conclusión.

En esta coyuntura debemos replicar ciertos planteamientos sobre la conveniencia de la preterición del trámite administrativo, y el uso del recurso del injunction, en este caso, en comparación con la *Sentencia* que recientemente emitimos en Moreno Ferrer v. Junta Reglamentadora del Cannabis Medicinal.[106] El razonamiento de ese dictamen, el cual por su naturaleza **no constituye un precedente**, se encuentra íntimamente relacionado con el argumento de la allí peticionaria de que el trámite administrativo que debía completar era fútil o inefectivo.[107] Gran parte de la preocupación aducida en ese caso se fundaba en la presunta ausencia de oficiales examinadores en la Junta Reglamentadora del Cannabis

---

[106] Moreno Ferrer v. Junta Reglamentadora del Cannabis Medicinal, 209 DPR 430 (2022).
[107] *Íd.*, pág. 443.

Medicina, al igual que un argumento sobre las facultades que poseía o no esa entidad administrativa.[108]

Aquí el planteamiento ha sido ubicado eminentemente como uno de falta de jurisdicción sobre la persona, donde basta solo interpretar el estatuto, pues el lenguaje que aquí nos ha ocupado no tiene nada en sí que requiera una interpretación pericial de parte de la agencia. Solo precisaba examinar un listado para colegir si este cobijaba bajo su alcance a los Delegados Congresionales.

Visto así, el injunction, como medida extraordinaria que evita la comisión de daños irreparables, resulta el mecanismo adecuado para salvaguardar los derechos de la peticionaria. Distinto a como lo caracterizaron los foros inferiores, no se trata de una mera alegación generalizada sobre el efecto que tendría un proceso cuasi penal en la reputación de la peticionaria. Realmente, se trata de la amenaza inminente de ser referida a un proceso de incumplimiento que bien pudiese redundar en multas y penas criminales. Distinto a como opinamos en *Moreno Ferrer*, esto no es pura especulación, pues se intima con claridad de las advertencias que le profirió la OEG a la peticionaria.

Así las cosas, el caso de autos guarda una estrecha relación con los postulados que anunciamos hace varios años en Yiyi Motors, Inc. v. ELA, *supra*. Bien entendido,

---

[108] *Íd.*

el alcance de ese caso no se limita únicamente a casos de naturaleza contributiva. Más bien, expone con meridiana claridad el proceso a seguir ante un planteamiento sustentado de falta de jurisdicción administrativa. Ante ello, reafirmamos que la peticionaria optó por el curso procesal adecuado para vindicar sus argumentos.

Finalmente, aprovechamos la ocasión para reafirmar nuestro compromiso con la función preeminente que realiza la OEG en el aparato gubernamental. Nada en este dictamen debe interpretarse como un rechazo a la importancia de asegurar un servicio público a la altura de los estándares éticos más exigentes. Sin embargo, por bien intencionada que sea, la autoridad administrativa solo puede manifestarse en virtud de una autorización válida de nuestra Asamblea Legislativa. Es la pluma del legislador, no el celo administrativo, la que delinea su ámbito de acción.

## IV

Por los fundamentos expuestos en la *Opinión* que antecede, se revoca la *Sentencia* emitida por el Tribunal de Apelaciones y se declara *con lugar* la solicitud de injunction permanente y sentencia declaratoria presentada por la Lcda. Zoraida Buxó Santiago. El Artículo 5.1 de Ley Orgánica de la Oficina de Ética Gubernamental contiene un listado taxativo de los funcionarios públicos obligados a rendir informes financieros ante la Oficina de Ética Gubernamental, que no incluye a los integrantes

de la Delegación Congresional de Puerto Rico. Como consecuencia, el Director de la Oficina de Ética Gubernamental carece de autoridad para exigirle a estos funcionarios la rendición de informes financieros.

Se dictará Sentencia en conformidad.


                                    Edgardo Rivera García
                                       Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Zoraida Buxó Santiago<br><br>Peticionaria<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Luis A. Pérez Vargas en su carácter oficial como Director de la Oficina de Ética Gubernamental<br><br>Recurridos | CC-2023-0543 | |

**SENTENCIA**

En San Juan, Puerto Rico, a 10 de diciembre de 2024.

Por los fundamentos expuestos en la *Opinión* que antecede, se revoca la *Sentencia* emitida por el Tribunal de Apelaciones y se declara *con lugar* la solicitud de injunction permanente y sentencia declaratoria presentada por la Lcda. Zoraida Buxó Santiago.

El Artículo 5.1 de Ley Orgánica de la Oficina de Ética Gubernamental contiene un listado taxativo de los funcionarios públicos obligados a rendir informes financieros ante la Oficina de Ética Gubernamental, que no incluye a los integrantes de la Delegación Congresional de Puerto Rico.

Como consecuencia, el Director de la Oficina de Ética Gubernamental carece de autoridad para exigirle a estos funcionarios la rendición de informes financieros.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Colón Pérez emitió una Opinión disidente. La Jueza Presidenta Oronoz Rodríguez disiente y emite las expresiones siguientes:

> "En esta ocasión, una mayoría de este Tribunal avala de manera implícita el uso de fondos públicos para adelantar intereses político-partidistas. La *Ley para crear la delegación congresional de Puerto Rico*, Ley Núm. 167-2020, 16 LPRA § 985 et sec., estableció la Delegación Congresional de Puerto Rico. El referido estatuto provee para la celebración de una elección especial para la selección de seis (6)

delegados congresionales. Esto con el fin de exigir al Congreso de los Estados Unidos la admisión de Puerto Rico como estado de los Estados Unidos. Los delegados congresionales se eligen mediante elección especial y se remuneran con fondos procedentes del erario.

Como es sabido, el Art. VI, Sec. 9, de la Constitución del Estado Libre Asociado de Puerto Rico establece que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 444. Cónsono con ello, hemos sentenciado que la noción de finalidad pública contemplada en la mencionada disposición constitucional juega un rol importante en nuestro ordenamiento jurídico, pues, a diferencia de las personas particulares —quienes pueden actuar para variados fines—, "'la búsqueda de un fin de interés público es la condición positiva de toda actuación estatal'". Báez Galib y otros v. C.E.E. II, supra, pág. 395. Véase P.I.P. v. C.E.E., 120 DPR 580, 606 (1988). De ese modo, todo organismo gubernamental está obligado a cumplir cabalmente con la anterior disposición, lo cual se logra utilizando los fondos públicos para fines públicos legítimos. Véase Aponte Rosario v. Presidente Comisión Estatal de Elecciones, 205 DPR 407 (2020) (Opinión disidente del Juez Asociado señor Colón Pérez); véase, además, Mun. Quebradillas v. Corp. Salud Lares, 180 DPR 1003, 1017 (2011); C.F.S.E. v. Unión de Médicos, 170 DPR 443, 452 (2009); De Jesús González v. A.C., 148 DPR 255, 268 (1999).

En el contexto de este axioma constitucional, considero que el análisis sobre los requerimientos del puesto objeto de esta controversia se ve afectado por el problema de base de la Ley que creó a la delegación congresional, y es que este diseño pretendió asignar fondos públicos para adelantar intereses político-partidistas y, en consecuencia, es inválido. Ahora bien, en este caso no se cuestiona la existencia de los delegados congresionales. Estemos de acuerdo o no con la encomienda delegada a estos, resulta evidente que las particularidades de su puesto llaman a la fiscalización. A más de tres años de su elección, es imperativo que exista un mecanismo de rendición de cuentas para estos,

cuya función principal de cabildeo en adelanto de la estadidad—y con poca supervisión—se presta para conflictos de interés y para el mal uso de fondos públicos. Como funcionarios electos, tienen que rendir cuentas".

El Juez Asociado señor Estrella Martínez no intervino.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Zoraida Buxó Santiago

    Peticionaria

        v.                   CC-2023-0543

Estado Libre Asociado de
Puerto Rico; Luis A. Pérez
Vargas en su carácter oficial
como Director de la Oficina
de Ética Gubernamental

    Recurridos

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 10 de diciembre de 2024.

Por entender que estamos ante una servidora pública llamada a rendir los informes financieros que mandata el Art. 5.1 de la *Ley Orgánica de Ética Gubernamental* (en adelante, "Ley de Ética Gubernamental"), *infra*, y que, cualquier reclamo que esta tuviese sobre el contenido de éstos, es la Oficina de Ética Gubernamental, y no los tribunales, quien -- en primera instancia -- está llamada a atender los mismos, respetuosamente disentimos del curso de acción seguido por una mayoría de mis compañeros y compañera de estrado en el presente caso. Veamos.

I.

Los hechos medulares que dan margen al presente litigio se recogen con particular precisión en la *Opinión* que hoy emite este Tribunal, razón por la cual hemos decidido adoptar los mismos por referencia. Ahora bien, en síntesis, podemos decir que este caso se origina a raíz de determinada elección especial, celebrada en nuestro País el pasado 16 de mayo de 2021, mediante la cual la Lcda. Zoraida Buxó Santiago (en adelante, "licenciada Buxó Santiago") fue electa como "delegada congresional", lo anterior de conformidad con lo dispuesto en la Ley Núm. 167-2020, mejor conocida como la *Ley para Crear la Delegación Congresional de Puerto Rico*, 16 LPRA secs. 985 *et seq*.

En virtud de ello, y dado el carácter sin precedente de la referida función pública, la Oficina de Ética Gubernamental (en adelante, "OEG"), luego de las evaluaciones de rigor, le requirió a los "delegados congresionales" electos, -- incluyendo a la licenciada Buxó Santiago --, la presentación de los informes financieros que exige el Art. 5.1 de la Ley de Ética Gubernamental, *infra*. Esto, por entender que los mencionados delegados congresionales son servidores públicos según definidos en la Ley de Ética Gubernamental, *infra*.

Habiendo cumplido inicialmente con los requerimientos de la OEG, tras diferencias entre las partes, la licenciada Buxó Santiago no reconoció la autoridad de dicha agencia gubernamental para requerirle la presentación de los

informes financieros en cuestión. A juicio de la referida letrada, y en virtud de su propia interpretación del precitado estatuto, ésta no estaba llamada a presentar los informes financieros requeridos por el Art. 5.1 de la Ley de Ética Gubernamental, *infra*.

Así las cosas, la licenciada Buxó Santiago presentó ante el Tribunal de Primera Instancia una *Petición urgente de entredicho provisional, interdicto preliminar y permanente y/o sentencia declaratoria*. En dicho recurso, la referida letrada sostuvo que el requerimiento que le cursó la OEG, y el cual es objeto de la presente controversia, fue emitido sin jurisdicción y era improcedente en derecho, puesto que su cargo como "delegada congresional" no estaba dentro del listado de servidores públicos obligados a presentar informes financieros anuales según estatuido en el Art. 5.1 de la Ley de Ética Gubernamental, *infra*. A dicha solicitud, la OEG se opuso.

Eventualmente, y contando con el beneficio de la comparecencia de ambas partes con interés en el litigio, el foro primario desestimó las causas de acción incoadas por la licenciada Buxó Santiago. Ello, al concluir que no existían fundamentos jurídicos que justificaran preterir el procedimiento administrativo que se estaba llevando a cabo ante la OEG. Agencia administrativa que, según razonó el Tribunal de Primera Instancia, tenía la pericia necesaria para resolver el reclamo de la referida letrada sobre el alcance del Art. 5.1 de la Ley de Ética Gubernamental, *infra*.

Dicha determinación fue, a su vez, confirmada por el Tribunal de Apelaciones.

Así pues, inconforme con los resultados obtenidos en los foros primario y apelativo intermedio, la licenciada Buxó Santiago acudió ante este Tribunal mediante un recurso de *certiorari*. Expedido el mismo en reconsideración, hoy una mayoría de mis compañeros y compañera de estrado, obviando el planteamiento jurisdiccional que se nos realiza, revoca la *Sentencia* emitida por el foro apelativo intermedio y resuelve,-- a través de una interpretación judicial en extremo textualista --, que el Art. 5.1 de la Ley Orgánica de Ética Gubernamental, *infra*, establece un listado taxativo de los servidores públicos que vienen obligados a rendir informes financieros, dentro del cual no se encuentran los llamados "delegados congresionales".

Por no estar de acuerdo con dicho proceder, como ya adelantamos, respetuosamente disentimos. Explicamos el porqué.

II.

A.

Como es sabido, el 3 de enero de 2012 la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 1-2012, 3 LPRA secs. 1854 *et seq.*, mejor conocida como la *Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico* (en adelante, y como previamente habíamos establecido, "Ley de Ética Gubernamental"). Con la aprobación de este estatuto, los señores legisladores y las señoras legisladoras buscaban

que, en nuestra jurisdicción, se contase con "un Código de Ética que reglamenta[se] la conducta de los servidores y ex servidores públicos de la Rama Ejecutiva, y que se constituye[se] como principio cardinal de esta legislación [el] proscribir las acciones improcedentes que ponen en riesgo la estabilidad del soporte moral del Estado". Exposición de Motivos de la Ley Núm. 1-2012 (2012 [Parte 1] Leyes de Puerto Rico 19). Véase, 3 LPRA. sec. 1857. Véanse, además, Opinión disidente del Juez Asociado Colón Pérez en *OEG v. Martínez Giraud*, 210 DPR 79, 112-113 (2022).

Establecido ello, entre las facultades y poderes que la Asamblea Legislativa le delegó a la OEG y su Dirección Ejecutiva, se encuentran, en lo pertinente, las siguientes:

C. **Interpretar, aplicar y hacer cumplir las disposiciones de esta Ley y de los reglamentos creados a su amparo, que establecen determinadas prohibiciones respecto a la conducta de los servidores públicos o que rigen las cuestiones de ética, de conflicto de intereses y de la presentación de los informes financieros.**

D. Promulgar los reglamentos, normas o directrices que sean necesarios y convenientes para cumplir con los propósitos de esta Ley.

E. Emitir opiniones sobre las disposiciones de esta Ley.

F. Emitir las órdenes que sean necesarias y convenientes para cumplir con sus funciones, responsabilidades y deberes bajo esta Ley.

G. Solicitar del Tribunal de Primera Instancia que obligue al cumplimiento de cualquier orden emitida por la Oficina.

H. Llevar a cabo la auditoría y la auditoría forense de los informes financieros, y recomendar la acción a seguir para corregir, procesar o referir las violaciones detectadas.

I. Citar, examinar, ordenar, requerir y obtener copia de todo documento o prueba relacionada con cualquier asunto que sea objeto de investigación o que esté en controversia ante la Oficina.

[. . .]

M. Resolver las controversias que surjan sobre la aplicación de esta Ley.

N. Designar oficiales examinadores o jueces administrativos para que presidan los procesos de adjudicación que se inicien como resultado de la presentación de una querella. Éstos tienen la facultad de emitir todas aquellas órdenes que sean necesarias para salvaguardar el debido proceso de ley de las partes.

Ñ. Establecer y administrar los procedimientos que identifiquen las violaciones a la ética gubernamental, para prevenir los conflictos de intereses y para tomar u ordenar las medidas disciplinarias, administrativas o civiles autorizadas por esta Ley, después de las correspondientes investigaciones y audiencias, en las que las partes afectadas tengan la oportunidad adecuada de ser oídas y de defenderse. (Énfasis nuestro). Art. 2.3, Ley de Ética Gubernamental. 3 LPRA sec. 1855b.

Como se puede apreciar, del inciso (c) de la precitada disposición legal claramente se desprende que entre las funciones que los señores legisladores y las señoras legisladoras le delegaron a la OEG, se encuentra el poder requerir informes financieros a diversos servidores públicos. **Empero, ¿cómo se define el término "informe financiero" para fines de la legislación aquí bajo estudio? ¿cómo se define el término "servidor público"?**

Para contestar las anteriores interrogantes, basta con acudir al Artículo 1.2, inciso (t), de la Ley de Ética

Gubernamental, *infra*, articulado que define el término *informe financiero* como,

> formulario oficial electrónico adoptado y provisto por la Oficina, y en el caso de la Rama Judicial el formulario oficial adoptado por el Tribunal Supremo, así como cualquier información adicional requerida por la Oficina o suministrada por el servidor o ex servidor público. El término incluye el informe financiero anual, de toma de posesión o de cese. 3 LPRA sec. 1854 (t).

En el inciso (gg) de la legislación aquí bajo estudio, por su parte, se define el término servidor público de la siguiente manera:

> **[P]ersona en el Gobierno que interviene en la formulación e implantación de la política pública** o no, aunque desempeñe su encomienda permanente o temporalmente, con o sin remuneración. También, incluye al contratista independiente cuyo contrato equivale a un puesto o cargo, o que entre sus responsabilidades está la de intervenir directamente en la formulación e implantación de la política pública. (Énfasis nuestro). 3 LPRA sec. 1854 (gg).

De conformidad con la normativa antes expuesta, y a la luz de las definiciones antes dadas, precisa señalar aquí que son varios los servidores públicos que están llamados a rendir los informes financieros objetos del presente litigio. Entre estos se encuentran, el Gobernador de Puerto Rico, los miembros de la Asamblea Legislativa, los funcionarios de la Rama Ejecutiva cuyos nombramientos requieran consejo y consentimiento del Senado o de la Asamblea Legislativa, y los jefes y subjefes de agencias, entre otros. Artículo 5.1 de la Ley de Ética Gubernamental, 3 LPRA sec. 1858. **En fin, toda**

**persona en el Gobierno que interviene en la formulación e implementación de la política pública.**

Sobre el alcance de la precitada disposición legal, no podemos ignorar el pronunciamiento que, al momento de adoptar la Ley de Ética Gubernamental vigente, hiciere la propia Asamblea Legislativa. Al respecto, y en lo relacionado al requerimiento de la presentación de informes financieros por parte de las personas que intervienen en la formulación e implantación de política pública, los señores legisladores y la señoras legisladora sostuvieron que el mismo responde al **"cumplimiento con el reclamo del Pueblo de que los servidores públicos elegidos o […] aquellos a quienes por la naturaleza del trabajo que realizan tienen que presentar una imagen intachable y libre de cualquier conflicto, sin importar la Rama del Gobierno en la cual se desempeñan [vengan llamados a satisfacer requisitos de esta naturaleza]"**. (Énfasis nuestro). Exposición de Motivos de la Ley Núm. 1-2012 (2012 [Parte 1] Leyes de Puerto Rico 19).

Siendo ello así, y contrario a lo que señala una mayoría de este Tribunal, no podemos considerar el listado establecido en el Art. 5.1 de la Ley de Ética Gubernamental, *supra*, como uno taxativo; sino, más bien, como uno que refleja aquellas y aquellos servidores públicos que, al momento de aprobarse la precitada ley, estaban llamados, -- al igual que hoy lo están los "delegados congresionales" --

,[1] a formular e implantar la política pública del Estado. En ese sentido, al tratarse de un estatuto que tiene más de una década de aprobado, este merece ser interpretado a la luz de las realidades políticas, sociales y económicas de nuestros tiempos y acorde con la precitada intención legislativa.

Sobre lo antes dicho, en innumerables ocasiones hemos sentenciado que la letra de la ley no debe seguirse ciegamente cuando ello iría en detrimento de su espíritu y fin. *Alonso García v. S.L.G.*, 155 DPR 91, 99 (2001); *Sucn. Álvarez v. Srio. de Justicia*, 150 DPR 252 (2000); *Pueblo v. Zayas Rodríguez*, 147 DPR 530 (1999). En escenarios como esos, es deber de los tribunales el interpretar los estatutos tomando en consideración el propósito social que los inspiró, dándoles un sentido lógico a sus diversas disposiciones y supliendo posibles deficiencias cuando sea necesario. *Alonso García v. S.L.G.*, *supra*, págs. 99-100; *Sucn. Álvarez v. Srio. de Justicia*, *supra*; *Pueblo v. Ferreira Morales*, 147 DPR 238 (1998). **Al así hacerlo, debemos de tomar en consideración que, "[e]n ocasiones, el legislador, consciente de la dificultad de elaborar una lista que cubra la totalidad de las instancias aplicables a la norma que adopta, se decide por incluir una abierta que incluya algunas, pero no todas, las posibles instancias**

---

[1] **A esos fines, véase *Exposición de Motivos* de la Ley Núm. 167-2020, mejor conocida como la *Ley para Crear la Delegación Congresional de Puerto Rico*, 16 LPRA secs. 985 et seq. (2020 [Parte 4] Leyes de Puerto Rico 3842-3848).**

**cobijadas por esta. De esta forma, este no se compromete a presentar una lista exhaustiva, permitiendo la extensión de la norma a otras instancias no mencionadas en el texto".** (Énfasis nuestro). J. M. Farinacci Fernós, *Hermenéutica Puertorriqueña: Cánones de Interpretación Jurídica*, San Juan, Editorial InterJuris, (2019), pág. 103.

### B.

De otra parte, y por considerarlo en extremo pertinente para la correcta disposición de los asuntos ante nuestra consideración, es menester señalar aquí que, según se establece en el Artículo 7.1 de la Ley de Ética Gubernamental, *infra*, cualquier persona o la OEG *motu proprio* puede iniciar una investigación para asegurar el cumplimiento de la legislación aquí bajo estudio. 3 LPRA sec. 1860. Sobre el particular, el Artículo 7.2, *infra*, establece que,

> una vez concluya la investigación aludida en el Artículo 7.1 y la Oficina entienda que se ha violado alguna disposición establecida en esta Ley, en los reglamentos, en las órdenes o en las normas promulgadas a su amparo, presentará una querella y llevará a cabo un procedimiento de adjudicación, de conformidad con la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada [Nota: Derogada y sustituida por la Ley 38-2017, "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico"]. 3 LPRA sec. 1860a.

Concluido el proceso antes descrito, el Artículo 7.3 del referido estatuto, *infra*, expresa que,

> [t]odo servidor público que resulte afectado en un proceso adversativo llevado a cabo en la Oficina que dé por terminado el asunto, tendrá derecho a presentar la correspondiente revisión ante el

Tribunal de Apelaciones, de conformidad con la Ley de Procedimiento Administrativo Uniforme [Nota: Derogada y sustituida por la Ley 38-2017, "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico"]. (Énfasis nuestro). 3 LPRA sec. 1860b.

Es, pues, a la luz del análisis antes expuesto que veníamos llamados a atender la presente controversia. Una mayoría de este Tribunal, sin embargo, falla en así hacerlo.

III.

Ahora bien, realizado, -- desde la disidencia --, el precitado análisis, no albergamos duda alguna que, contrario a lo hoy sentenciado por mis compañeros y compañera de estrado, la licenciada Buxó Santiago, como "delegada congresional" electa, tenía, y tiene, el deber ético de presentar sus informes financieros ante la OEG. Así claramente surge de un estudio integral, sosegado y desapasionado de la Ley de Ética Gubernamental, *supra*, su *Exposición de Motivos* y los propósitos para la que esta fue legislada.

En consecuencia, la "delegada congresional" Buxó Santiago como servidora pública que interviene en la formulación e implantación de la política pública de hacer valer "el mandato a favor de la estadidad" alegadamente expresado por nuestro Pueblo en las urnas, -- véase, *Ley para Crear la Delegación Congresional de Puerto Rico*, *supra* --, y quien fue electa mediante el voto directo de los puertorriqueños y puertorriqueñas, no podía ser eximida de la obligación de rendir sus informes financieros. Acceder a

tal exención, -- como hoy hace una mayoría de esta Curia --, nos llevaría a traicionar "el reclamo del Pueblo de que los servidores públicos elegidos o de que aquellos a quienes por la naturaleza del trabajo que realizan tienen que presentar una imagen intachable y libre de cualquier conflicto, sin importar la Rama del Gobierno en la cual se desempeñan [vengan llamados a satisfacer requisitos de esta naturaleza]". Exposición de Motivos de la Ley Núm. 1-2012 (2012 [Parte 1] Leyes de Puerto Rico 19). Lo anterior, abriendo la puerta para que florezca, en este jardín ya demasiado tupido, el peligroso y ominoso yerbajo de la corrupción.

Y es que, con la *Opinión* que hoy emite este Tribunal, no solo se permite la continuación del desembolso de fondos públicos para promocionar y adelantar determinada agenda político-partidista,[2] sino que, además, -- a través de una interpretación en extremo textualista de la Ley de Ética Gubernamental, *supra*, --, se consiente a que quienes reciben esos fondos puedan desempeñar sus cuestionables funciones ocultando posibles conflictos de intereses. **El deber del Estado de procurar el más limpio y honrado desempeño de las funciones públicas en nuestro País no puede claudicar ante semejantes interpretaciones textualistas como la que hoy aquí se refrenda.**

---

[2] Sobre el particular, véanse nuestros Votos Disidentes en *Rosario Rodríguez v. Rosselló et al. II*, 207 DPR 870 (2021) y en *Gobierno de Puerto Rico v. Torres Rodríguez*, 210 DPR 891 (2022).

El derecho, al igual que las sociedades, evoluciona. Es, por tanto, y como ya mencionamos, deber del jurista o la jurista, al momento de enfrentar la norma, el tomar en cuenta los factores políticos, sociales y económicos en los que ésta se desenvuelve. Es así, y solo así, que el juez o la jueza estará en mejor posición para encontrar su verdadero sentido.

IV.

Dicho ello, y contrario a lo hoy sentenciado por este Tribunal, somos del criterio de que en el presente caso la OEG sí tenía jurisdicción para atender, -- en primera instancia --, los reclamos levantados por la licenciada Buxó Santiago. Procedía, pues, permitir que continuara el procedimiento administrativo ante la referida agencia, la cual, con la facultad delegada por la Asamblea Legislativa para interpretar y aplicar su ley orgánica, podía ponernos en mejor posición para, en su día, y de ser necesario, ejercer nuestra facultad revisora, si así se nos solicitaba.[3]

V.

---

[3] En ese sentido, entendemos que no se debió preterir el procedimiento administrativo en curso ya que no era de aplicación ninguna excepción a la doctrina de agotamiento de remedios administrativos. Recordemos que, a modo de excepción, se ha establecido que una parte no está obligada a agotar los remedios administrativos cuando:

(1) dar curso a la acción administrativa cause un daño inminente, material, sustancial y no teórico o especulativo; (2) el remedio administrativo constituya una gestión inútil, inefectiva y que no ofrezca un remedio adecuado; (3) la agencia claramente no tenga jurisdicción sobre el asunto y la posposición conllevaría un daño irreparable al afectado, o (4) el asunto es estrictamente de derecho. *ORIL v. El Farmer, Inc.*, 204 DPR 229, 240 (2020).

Excepciones que, como hemos visto, no están presentes en la actual controversia.

Por no ser ese el curso de acción seguido por una mayoría de este Tribunal en el día de hoy, disentimos.


                                    Ángel Colón Pérez
                                    Juez Asociado