ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| OFICINA DE ÉTICA GUBERNAMENTAL<br><br>RECURRIDO<br><br>V.<br><br>JAIME H. BARLUCEA MALDONADO<br><br>RECURRENTE | KLRA202500168 | *REVISIÓN JUDICIAL* procedente de la Oficina de Ética Gubernamental<br><br>Caso Número: 21-39<br><br>Sobre:<br>Violación a los Incisos (q), (r) y (s) del Artículo 4.2 de la Ley Núm. 1-2012, Según Enmendada, Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico |
| OFICINA DE ÉTICA GUBERNAMENTAL<br><br>RECURRIDO<br><br>V.<br><br>CLARIBEL PAGÁN CUEVAS<br><br>RECURRENTE | | *REVISIÓN JUDICIAL* procedente de la Oficina de Ética Gubernamental<br><br>Caso Número: 21-40<br><br>Sobre:<br>Violación a los Incisos (q), y (s) del Artículo 4.2 de la Ley Núm. 1-2012, Según Enmendada, Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico |

Panel integrado por su presidenta, la juez Brignoni Mártir, la jueza Alvarez Esnard, y la jueza Prats Palerm

Brignoni Mártir, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de mayo de 2025.

Comparecen ante nos, Jaime H. Barlucea Maldonado ("el señor Barlucea") y Claribel Pagán Cuevas ("la señora Pagán"), en adelante, en conjunto, "la parte recurrente" o "los querellados," a los fines de solicitar nuestra intervención para que dejemos sin efecto la "*Resolución*" emitida y notificada el 28 de enero de 2025, por el Director Ejecutivo de la Oficina de Ética Gubernamental de Puerto Rico. Mediante la referida "*Resolución*," se adoptó en su totalidad el "*Informe del Oficial Examinador.*" En consecuencia, se impuso al señor Barlucea una multa

Número Identificador
SEN2025 _____

administrativa total de $4,000.00 y a la señora Pagán una multa administrativa total de $2,000.00. Ambas multas, por infracción al Artículo 4.2(q), de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley Núm. 1-2012, según enmendada, 3 LPRA 1857a. Todo, dentro de un caso sobre infracciones éticas imputadas a la parte recurrente por la Oficina de Ética Gubernamental (en lo sucesivo, "OEG").

Por los fundamentos que expondremos a continuación, *confirmamos* la "*Resolución*" recurrida.

**I.**

El 9 de febrero de 2021, la OEG presentó dos querellas.[1] Una de ellas en contra del señor Barlucea y la otra en contra de la señora Pagán. Ambas reclamaciones contienen alegaciones de infracciones éticas alegadamente cometidas por la referida parte recurrente durante el ejercicio de sus respectivos cargos públicos. El señor Barlucea ocupó la posición de alcalde del Municipio de Adjuntas desde el año 2004 al año 2020. Por su parte, la señora Pagán ocupó el puesto de directora de Recursos Humanos del aludido municipio desde el año 2005 al año 2021. Los hechos que motivaron dichas querellas se relatan a continuación.

Surge del expediente, que el día 28 de abril de 2008, el Municipio de Adjuntas emitió la Ordenanza Municipal, Núm. 17, serie 2007-008. Mediante esta, se creó el "Programa Municipal de Incentivos de Intercambio Cultural para los Estudiantes Graduandos a Nivel Superior de Escuelas Públicas y Privadas de Adjuntas." El desarrollo del viaje estuvo a cargo de la Agencia de Viajes Holiday Group, la cual era presidida por el señor Luis Enrique Correa. El transporte, la comida, el hospedaje y otras actividades del aludido viaje fueron sufragados con fondos públicos del Municipio de Adjuntas. El periodo seleccionado para el viaje comprendió desde el día 21 de junio de 2013 al 9 de julio de 2013.

---

[1] El 18 de julio de 2022, la OEG presentó "*Moción Solicitando Consolidación de Querellas*." Mediante esta, peticionó la consolidación de las reclamaciones existentes contra el señor Barlucea y la señora Pagán. A través de la "*Orden*" emitida el 29 de julio de 2022, se concedió la referida petición de consolidación.

Así las cosas, el 8 de abril de 2013, el Municipio de Adjuntas celebró un sorteo mediante el cual seleccionó los diez (10) estudiantes que participarían del referido viaje. De los diez estudiantes seleccionados, dos indicaron que no realizarían el viaje. Uno de ellos se trató del estudiante Jesús J. Barriera Bonilla. En cuanto al aludido estudiante Barriera Bonilla, el 28 de mayo de 2013, el señor Barlucea solicitó a la agencia de viajes que cancelaran el viaje de dicho estudiante. Al siguiente día, el presidente de la agencia de viajes alegadamente le indicó al señor Barlucea que no tenía derecho a un reembolso por la cancelación solicitada.

Con relación a las infracciones éticas, la OEG aseveró que el 17 de julio de 2013, la parte recurrente emitió un "*Informe de Viaje a España, Portugal y Marruecos.*" Adujo, además, que dicho informe fue suscrito y certificado por la parte recurrente a sabiendas de que contenía información falsa. Arguyó que en el referido informe se comunicó erróneamente que el estudiante Barriera Bonilla había viajado. A su vez, alegó que en el aludido informe se omitió el hecho de que la hija del señor Barlucea y la esposa del presidente de la agencia de viajes habían viajado junto al grupo de estudiantes.

En el caso particular de la señora Pagán, la OEG sostuvo, que el 2 de mayo de 2013, la referida señora suscribió la factura 190-13 del viaje a sabiendas de que la información sobre los viajantes era errónea. Ante ello, adujo que la señora Pagán infringió el Artículo 4.2(q) de la Ley de Ética Gubernamental, *supra*. De igual modo, aseveró que puso en duda la integridad de la función gubernamental, según se establece en el Artículo 4.2(s) de la Ley de Ética Gubernamental, *supra*. En lo que respecta al señor Barlucea sostuvo, que el 15 de mayo de 2017, a petición de la Oficina del Contralor, expidió una certificación en la que replicó las mismas declaraciones falsas contenidas en el *Informe de Viaje a España, Portugal y Marruecos.*" Ante ello, arguyó que el señor Barlucea infringió el Artículo 4.2(q), *supra*; omitió recobrar los fondos federales

desembolsados para el viaje del estudiante Barriera Bonilla, en contravención del Artículo 4.2(r) de la Ley de Ética Gubernamental, *supra*; y puso en duda la integridad gubernamental, según se establece el Artículo 4.2(s), *supra.* En vista de tales aducidos incumplimientos éticos, peticionó que se le impusiera a la parte recurrente una multa de hasta $20,000.00 por cada infracción y una sanción civil equivalente a tres (3) veces el valor del beneficio económico recibido.

En reacción, el 12 de agosto de 2021, la señora Pagán presentó "*Contestación a Querella*." Admitió que ocupaba el puesto de directora de Recursos Humanos en el momento de los hechos relatados en la querella. A su vez, aceptó los hechos relacionados a la gestión del viaje estudiantil. En específico, expresó como cierto que uno de los estudiantes indicó que no participaría del viaje y que el 28 de mayo de 2013, el señor Barlucea se comunicó con la agencia de viajes para cancelar la reservación de dicho estudiante. Además, aseveró que asistió al referido viaje y que suscribió la factura 190-13 relacionada a las reservaciones del viaje estudiantil. No obstante, negó las alegaciones éticas levantadas en su contra. Como parte de sus defensas afirmativas, sostuvo que no cometió algún acto intencional o negligente; que no recibió beneficio económico alguno ni incentivó un mal manejo de fondos públicos. De igual modo, alegó que no omitió la ejecución de algún deber dispuesto por ley, y que en todo caso sus actuaciones fueron por error e inadvertencia excusables.

Por su parte, el 1 de noviembre de 2021, el señor Barlucea presentó "*Contestación a querella*." En esencia, admitió que al momento de los hechos relatados en la querella ocupaba el cargo de alcalde del Municipio de Adjuntas. De igual modo, indicó como hechos ciertos la realización del viaje estudiantil del año 2013, y que el estudiante Barriera Bonilla declinó participar del referido viaje. A tono de ello, sostuvo que el 28 de mayo de 2013 se comunicó con la agencia de viajes en aras de cancelar la reservación del aludido estudiante. Sin embargo, negó las

infracciones éticas que la OEG asevera que cometió. Entre sus defensas afirmativas, sostuvo que sus actuaciones no pusieron en duda la integridad de la función gubernamental; que cumplió con los deberes dispuestos en la ley, y que no provocó la pérdida de fondos públicos. Además, arguyó que no emitió informe o certificación alguna con intención de falsificar hechos ni con conocimiento de que estos desprendían un contenido erróneo. Adujo, que en sus actuaciones medió error e inadvertencia excusable.

Tras varios trámites procesales que no son necesarios de pormenorizar, los días 13 de mayo de 2022 y 15 de julio de 2022, ambas partes querelladas presentaron "*Informe de Conferencia con Antelación a la Audiencia.*" En el caso del señor Barlucea, las partes estipularon los siguientes hechos:

1. El Sr. Jaime H. Barlucea Maldonado (en adelante, querellado) fue alcalde del Municipio de Adjuntas (en adelante Municipio) desde el año 2004 hasta el año 2020.

2. El Sr. Jaime H. Barlucea Maldonado era servidor público al momento de los hechos que se alegan en la querella y conforme lo define el Artículo 1.2 (gg) de la Ley 1-2012, antes citada.

3. Mediante la Ordenanza 17, Serie 2007-008, del 28 de abril de 2008, el Municipio creó el Programa Municipal de Incentivos de Intercambio Cultural para los Estudiantes Graduandos a Nivel Superior de las Escuelas Públicos y Privadas de Adjuntas (Programa).

4. El 8 de marzo de 2013 el Sr. Jaime H. Barlucea Maldonado, Exalcalde de Adjuntas, designó a la Sra. Claribel Pagán Cuevas para que fuese la funcionaria femenina que acudiría en el Viaje.

5. El 8 de abril de 2013 el Municipio seleccionó mediante sorteo a 10 estudiantes que participarían del viaje. Posteriormente una de las estudiantes declinó participar del viaje y el número de estudiantes fue reducido a 9.

6. Antes del viaje la Sra. Claribel Pagán Cuevas firmó la factura 190-13 de la Agencia de Viajes Holiday Group (Holiday), del 2 de mayo de 2013.

7. El 3 de mayo de 2013 el Municipio desembolsó el pago por la factura 190-3 de Holiday.

8. El 28 de mayo de 2013 el Sr. Barlucea Maldonado solicitó a Holiday la cancelación de la reservación del estudiante Jesús J. Barriera Bonilla y le requirió a Holiday que se le informara de los cargos por cancelación.

9. El Sr. Jaime H. Barlucea Maldonado participó del viaje estudiantil que se realizó desde el 21 de junio hasta el 9 de julio de 2013.

10. El viaje se realizó a España, Portugal y Marruecos.

11. El viaje era de tipo integral, en cual incluyó transportación, alojamiento comidas y otros gastos.

**12. El estudiante Jesús J. Barriera Bonilla no fue al viaje luego de haber sido seleccionado.**

**13. El Sr. Jaime H. Barlucea Maldonado firmó el "Informe de Viaje a España, Portugal y Marruecos el 21 de junio al 9 de julio de 2013" fechado 17 de julio de 2013**.

Para el caso de la señora Pagán, las partes estipularon los mismos hechos relacionados al viaje estudiantil, según esbozados en el informe del señor Barlucea. Añadieron de forma particular los siguientes hechos:

1. La Sra. Claribel Pagán Cuevas fue la directora de Recursos Humanos del Municipio de Adjuntas desde el 11 de enero de 2005 hasta el 10 de enero de 2021.

2. La Sra. Claribel Pagán Cuevas era servidora pública, al momento de los hechos que se alegan en la querella y conforme lo define el artículo 1.2 (gg) de la Ley 1-2012, antes citada.

3. La Sra. Claribel Pagán participó del viaje estudiantil que se realizó desde el 21 de junio hasta el 9 de julio de 2013.

**4. La Sra. Claribel Pagán Cuevas firmó el "Informe de Viaje a España, Portugal y Marruecos el 21 de junio al 9 de julio de 2013" fechado 17 de julio de 2013**.

La audiencia de los casos consolidados se celebró los días 6 y 7 de diciembre de 2022; 20 de junio de 2023 y 5 de octubre de 2023. Surge del "*Informe del Oficial Examinador*" que las partes estipularon durante la vista un total de veintiséis (26) documentos. También se desprende del referido informe que las partes presentaron en dicha vista el testimonio de cuatro (4) testigos, cada una.

Concluida la audiencia, surge de la "*Minuta*" emitida el 10 de octubre de 2023, que a las partes se les concedió un término de treinta (30) días para presentar por escrito sus argumentaciones finales. En cumplimiento de ello, el 13 de noviembre de 2023, la OEG presentó

"*Argumentación Final /Memorando de la Parte Querellante*" y la parte recurrente presentó "*Alegato de las partes querelladas.*"

Sometido el caso para adjudicación, el 17 de diciembre de 2024, el Oficial Examinador presentó ante el Director Ejecutivo de la OEG un "*Informe del Oficial Examinador.*" A través del referido informe, el Oficial Examinador recomendó que se le debía imponer a la parte recurrente una multa administrativa por violentar el Artículo 4.2(q), *supra*. Expresó, que el señor Barlucea infringió el precitado artículo en dos ocasiones al firmar el "*Informe de Viaje a España, Portugal y Marruecos"* del año de 2013 y al suscribir la "*Certificación*" del 15 de mayo de 2017, requerida por la Oficina del Contralor de Puerto Rico. Expresó, además que la señora Pagán infringió en una ocasión el aludido Artículo 4.2(q), *supra*, al también suscribir el "*Informe de Viaje a España, Portugal y Marruecos"* del año 2013. En cuanto al resto de las infracciones éticas, el Oficial examinador recomendó que se debían archivar por no demostrarse que hayan sido infringidas por la parte recurrente.

El 28 de enero de 2025, el Director Ejecutivo de la OEG notificó la "*Resolución*" que hoy nos ocupa. Mediante esta, adoptó en su totalidad el "*Informe del Oficial Examinador."* En consecuencia, le impuso al señor Barlucea una multa administrativa total de $4,000.00 y a la señora Pagán una multa administrativa total de $2,000.00. Ambas multas, por infracción al Artículo 4.2 (q), *supra.* A su vez, archivó el resto de las imputaciones éticas alegadas en las querellas.

Además, adoptó del "*Informe del Oficial Examinador*" las siguientes determinaciones de hecho:

1. Holiday es una corporación doméstica, con fines de lucro, con licencia de mayorista de excursiones. El señor Correa Nieves es el dueño de Holiday.

2. El señor Barlucea Maldonado fue alcalde del Municipio desde enero de 2005 hasta el 2020.

3. El Lcdo. Carlos E. Maltés Pérez fue el asesor legal del querellado durante su incumbencia como alcalde del Municipio.

4.  La señora Pagán Cuevas fue la directora de Recursos Humanos del Municipio desde el 11 de enero de 2005 hasta el 10 de enero de 202l.

5.  El señor Barlucea Maldonado y la señora Pagán Cuevas eran servidores públicos al momento de los hechos que se alegan en sus respectivas querellas y conforme se define dicho concepto en el artículo l.2(gg)de la Ley 1.

6.  Mediante la Ordenanza 17, Serie 2007-2008, del 28 de abril de 2008, el Municipio creó el *Programa Municipal de Incentivos de Intercambio Cultural para los Estudiantes Graduandos a Nivel Superior de las Escuelas Públicas y Privadas d Adjuntas* (Programa de Incentivos).

7.  Mediante la Ordenanza 12, Serie 2008-2009, del 6 de abril de 2009, el Municipio enmendó la Ordenanza 17, Serie 2007-2008, para aclarar la intención legislativa de dicho Programa de Incentivos.

8.  El Programa de Incentivos disponía para otorgar viajes de intercambio cultural sufragados por el Municipio para estudiantes graduandos de nivel superior que mantuvieran un alto grado de aprovechamiento académico.

9.  El 22 de febrero de 2023, la Sra. Yanira Torres de Ríos; directora escolar de la Escuela Superior José Emilio Lugo Ponce de León de Adjuntas, le envió al señor Barlucea Maldonado el listado oficial de 53 estudiantes de duodécimo grado del Cuadro de Honor 2013 de dicha unidad educativa. Los documentos relacionados con dicho asunto fueron recibidos en la alcaldía ese mismo día.

10. Al momento de los hechos, la Escuela Superior José Emilio Lugo Ponce de León era la única escuela superior ubicada en el Municipio de Adjuntas.

11. El 8 de marzo de 2013, el señor Barlucea Maldonado designó a la señora Pagán Cuevas para que fuese la funcionaria femenina que acudiría al viaje estudiantil 2013.

12. El lunes, 8 de abril de 2013, se llevó a cabo el acto de selección de los estudiantes "[…] participantes al programa de intercambio estudiantil que ofrece el Municipio de Adjuntas.

    "[…] Se procedió a hechar (sic.) en una bolsa de papel cincuenta y tres (53) nombres de la lista provista por el Departamento de Educación de los graduandos que tenían aquellos atributos para poder ser seleccionado para participar del programa." El Municipio seleccionó a 10 estudiantes que participarían de! viaje estudiantil 2013 mediante sorteo.'5 Los estudiantes seleccionados fueron: (1) Kennia Rodríguez Natal; (2) Verónica López Callejo; (3) Jesús L. Barriera Bonilla; (4) Yashira Santiago Cartagena; (5) Femando L. Torré Rullán; (6) Nathalia Serrano Rivera; (7) Rodrigo S. E. Ortiz Figueroa; (8) Alexis Brebán Torres; (9) Sahira Z. Irizarry Santos; y (10) María del C. Ramírez Torres.

13. El lunes, 8 de abril de 2013, el señor Barlucea Maldonado entregó personalmente a los 10 estudiantes seleccionados una carta, en la que les notificó ese hecho. Además, los citó a una reunión en la Casa Alcaldía para el viernes, 12 de abril de 2013, a las 3:00 p.m. para orientarnos sobre la coordinación y demás requisitos para participar del viaje estudiantil 2013.

14. El viernes, 12 de abril de 2013, se llevó a cabo la reunión en la Casa Alcaldía, en la oficina del señor Barlucea Maldonado. Los 10 estudiantes seleccionados asistieron a la misma. El estudiante Jesús L. Barriera Bonilla y su padre, el Sr. Miguel Barriera Pacheco, brindaron el número de teléfono celular del estudiante, el del padre, el de la madre y el de la residencia familiar.

15. En dicha reunión se les explicó a los asistentes la ropa que deberían llevar al viaje, el dinero personal a llevar y que debían entregar copia del pasaporte en la alcaldía para confirmar su asistencia al viaje estudiantil 2013.

16. La estudiante seleccionada, Nathalia Serrano Rivera, rápidamente declinó participar en el viaje estudiantil, y la cantidad de estudiantes participantes se redujo a 9.

17. El estudiante Jesús L. Barriera Bonilla entregó copia de su pasaporte en la alcaldía unos días después de la reunión del viernes, 12 de abril de 2013.

18. El 30 de abril de 2013, se llevó a cabo una segunda reunión sobre el viaje estudiantil 2013 en la Casa Alcaldía. Los estudiantes Jesús L. Barriera Bonilla y Fernando L. Torré Rullán no asistieron a dicha reunión.

19. Como parte del proceso de reservaciones para el viaje estudiantil 2013, el señor Barlucea Maldonado les indicó, verbalmente, a los representantes de Holiday las alternativas de destinos considerados para el viaje, la cantidad de personas que participarían y la fecha de éste. Posteriormente, un representante de Holiday envió un itinerario y cotización del costo por persona. Luego, el Municipio aceptó la propuesta de viaje que le presentó Holiday.

20. El 2 de mayo de 2013, Holiday le envió al director de Finanzas del Municipio, Sr. Jorge I. Quiles Feliciano, la factura #190-13. En ésta, Holiday facturó el costo del viaje para 11 personas; 10 personas en acomodo doble por $5,280.00 por persona, y una persona en acomodo sencillo por la cuantía de $5,970.00, para un total de $5 8,770.00.

21. El 3 de mayo de 2013, el Municipio desembolsó el pago por la factura #190-13 de Holiday mediante el cheque núm. 044887.

22. La Sra. Yolanda Correa tenía planificado viajar a España, Portugal y Marruecos. El señor Correa Nieves cambió el itinerario de viaje de la Sra. Yolanda Correa para que fuera igual al itinerario del programa del viaje estudiantil 2013 y participara en el mismo.

23. El 15 de mayo de 2013, el señor Correa Nieves pagó, con su tarjeta de crédito American Express, un viaje para su esposa, la Sra. Yolanda Correa, saliendo el 21 de junio de 2013 en el vuelo US Airways 0741 desde San Juan, Puerto Rico, con destino a Madrid, España, y regresando el 9 de julio de 2013 en el vuelo US Airways 0740 desde Madrid, España, con destino a San Juan, Puerto Rico. El valor de dicha transacción fue de $4,049.99.

24. El 28 de mayo de 2013, el señor Barlucea Maldonado solicitó, verbalmente y por escrito, a Holiday la cancelación de la reservación del estudiante Jesús J. Barriera Bonilla, y le requirió a Holiday que se le informara de los cargos por cancelación.

25. Mediante carta del 29 de mayo de 2013, el señor Correa Nieves le informó al señor Barlucea Maldonado que no existía la posibilidad de reembolso por la cancelación de la reservación del estudiante Jesús J. Barriera Bonilla. Ello, entre otros detalles, porque la solicitud de cancelación se hizo con menos de 30 de días de anticipación a la salida.

26. El jueves, 30 de mayo de 2013, se llevó a cabo una tercera reunión sobre el viaje estudiantil 2013 en la Casa Alcaldía. Los estudiantes Jesús L. Barriera Bonilla y Alexis Brebán Torres no asistieron a la misma.

27. Antes del viaje, la señora Pagán Cuevas firmó la factura #190-13 emitida por Holiday el 2 de mayo de 2013.

28. El 18 de junio de 2013, el señor Correa Nieves emitió el recibo de pago núm. 290673, a favor de la señorita Barlucea Rodríguez, por la cantidad de $5,280.00. El pago fue realizado por la señorita Barlucea Rodríguez mediante el cheque de gerente núm. 103115900005099, del Banco Popular de Puerto Rico, por $3,000.00 y $2,28000 en efectivo. El recibo indica que el pago fue hecho para "España-Portugal-Marruecos".

29. El señor Barlucea Maldonado y la señora Pagán Cuevas participaron del viaje estudiantil 2013, que se realizó desde el 21 de junio hasta el 9 de julio de 2013.

30. La señorita Barlucea Rodríguez y la Sra. Yolanda Correa participaron del viaje estudiantil 2013 que se realizó desde el 21 de junio hasta el 9 de julio de 2013.

31. Los participantes del viaje estudiantil 2013 salieron el 21 de junio de 2013 en el vuelo de US Airways 741 desde San Juan, Puerto Rico, con destino a Madrid, España, y regresaron el 9 de julio de 2013 en el vuelo US Airways 740 desde Madrid, España, con destino a San Juan, Puerto Rico.39 El viaje estudiantil 2013 fue para España, Portugal y Marruecos.

32. El viaje estudiantil 2013 fue de tipo integral, el cual incluyó transportación, alojamiento, comidas y otros gastos.

33. El estudiante Jesús J. Barriera Bonilla no fue al viaje estudiantil 2013 luego de haber sido seleccionado.

34. El señor Barlucea Maldonado y la señora Pagan Cuevas sabían que el estudiante Jesús L. Barriera Bonilla no había participado en el viaje estudiantil 2013.

35. El 17 de julio de 2013, el señor Barlucea Maldonado y la señora Pagán Cuevas firmaron el Informe de Viaje a España, Portugal y Marruecos (del 21 de junio al 9 de julio de 2013) (en adelante "Informe de Viaje 2013"). En dicho informe indicaron que "[como parte de la delegación de estudiantes seleccionados para la experiencia de intercambio cultural por nuestro pueblo viajaron las siguientes personas:

[. . .]
6. Jesús J. Barriera Bonilla […]

36. La OCPR realizó una auditoría de cumplimiento de las operaciones fiscales realizadas por el Municipio desde el 1 de enero de 2013 hasta el 31 de diciembre de 2016.

37. El 15 de mayo de 2017, el señor Barlucea Maldonado le certificó a la OCPR lo siguiente:

> Por este medio certifico y hago constar que, los estudiantes que participaron del viaje estudiantil del año 2013 y 2014, son los siguientes:

| Viaje estudiantil año 2013 | Viaje estudiantil año 2014 |
|---|---|
| […]<br>3. Jesús Barriera Bonilla<br>[…] | […] |

> Ninguno de los estudiantes canceló su participación.

38. El Lcdo. Carlos E. Maltés Pérez redactó los borradores del Informe de Viaje a España, Portugal y Marruecos (del 21 de junio al 9 de julio de 2013), firmado por los querellados el 17 de julio de 2013, y de la Certificación suscrita por el señor Barlucea Maldonado el 15 de mayo de 2017.

39. El 12 de junio de 2017, la señora Pagán Cuevas le declaró a la OCPR que el estudiante Jesús L. Barriera Bonilla no participó del viaje estudiantil 2013.

40. El 21 de junio de 2019, se circuló, en la OCPR, el Memorando OALIL-SP-2019-19 sobre Uso indebido de fondos públicos para sufragar viaje estudiantil a un tercero por el Municipio de Adjuntas, Consulta CL-M-18-14100-02. En la página 21 de dicho memorando se recomienda referir el asunto a la OEG.

41. Mediante carta del 12 de noviembre de 2019, la OCPR remitió a la OEG el asunto que aquí nos ocupa.

42. El 11 de agosto de 2020, la OCPR emitió el Informe de Auditoría M-21-07 (Informe de Auditoría) sobre las operaciones fiscales realizadas por el Municipio desde el 1 de enero de 2013 hasta el 31 de diciembre de 2016.52 En dicho Informe de Auditoría se le recomendó al querellado, entre otros asuntos, que recobrara de Holiday o de su presidente, los $5,280.00 por la reservación del estudiante que no participó del viaje.

43. El 31 de agosto de 2020, el Municipio presentó una Demanda de cobro de dinero contra Holiday y/o su presidente, el señor Correa Nieves, Civil Núm. CG2020CV01779. En resumen, el Municipio le informó al Tribunal de Primera Instancia (TPI), Sala de Caguas, que la OCPR le requirió al alcalde, en el Informe de Auditoría, que recobrara los $5,280.00 del mayorista. En atención a ello, solicitó se determinara si procedía el recobro y, de ser así, que se le ordenara a Holiday la devolución de la cuantía solicitada.

44. Luego de varios trámites judiciales, el 15 de diciembre de 2020, el Municipio presentó ante dicha Curia una Moción solicitando Sentencia por las alegaciones. En síntesis, el Municipio planteó que había solicitado en varias ocasiones a la OCPR que le entregara la evidencia documental que sustenta las conclusiones del Informe de Auditoría, pero que dicha agencia no le proveyó la prueba. También, indicó que la evidencia presentada en el caso, por Holiday, contradice los señalamientos y conclusiones de la OCPR en el Informe de Auditoría, por lo que el Municipio se encontraba en estado de indefensión. En atención a ello, el Municipio le solicitó al tribunal que dictara sentencia de conformidad a las alegaciones de las partes y a base de la prueba presentada y que decretara que el pasaje de la Sra. Yolanda De Correa no fue adquirido con fondos públicos y sí

mediante el sistema de puntos de la tarjeta American Express del señor Correa Nieves.

45. Mediante *Sentencia* del 19 de enero de 2021, el TPI decretó el archivo con perjuicio del caso Municipio de Adjuntas y. Holiday Group, Corp., Civil Núm. CG2020CV01779, sin especial imposición de costas ni honorarios de abogado.

46. El 9 de febrero de 2021, se presentaron las querellas que nos ocupan.

Oportunamente el 16 de febrero de 2025, la parte recurrente presentó un escrito de "*Reconsideración.*" En atención a dicho escrito, el 25 de febrero de 2025, la OEG notificó "*Resolución en Reconsideración,*" denegando la misma.

Aun en desacuerdo, el 21 de marzo de 2025, la parte recurrente compareció ante este Tribunal a través de un escrito de revisión judicial. Mediante este, esbozó los siguientes señalamientos de error:

Erró la OEG al concluir que los recurrentes incurrieron en violación al artículo 4.2 (q) de la Ley de Ética Gubernamental sin que exista prueba clara, robusta y convincente de que estos tenían conocimiento del contenido erróneo y del error de redacción al momento de estos suscribir el documento. Con[s]tituyendo un mero error que no establece una violación ética contraria al propósito para el cual fue aprobado la legislación.

Erró la OEG al concluir que lo recurrentes incurrieron en violación al artículo 4.2(q) de la Ley de Ética Gubernamental penalizando y elevando un error a una violación de carácter ético resultado incompatible y contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve, constituyendo una actuación que resulta irrazonable, ilegal y que a la comisión de una injusticia y en abuso de discreción. Ello contrario a la prueba clara, robusta y convincente que establece que se trató de un error sin consecuencias económicas o jurídica alguna.

El 7 de abril de 2025, este Tribunal emitió una "*Resolución*" mediante la cual le concedió a la OEG un término de treinta (30) días para presentar su oposición al recurso de revisión judicial. Además, requirió que se presentara copia certificada de los expedientes administrativos.

En cumplimiento de ello, el 11 de abril de 2025, la OEG presentó los expedientes administrativos requeridos. Asimismo, el 15 de abril de 2025, la OEG presentó su "*Alegato en Oposición.*"

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver la controversia que hoy nos ocupa.

**II.**

**A. Revisión Judicial de las Decisiones Administrativas**:

La revisión judicial de determinaciones administrativas está limitada por los parámetros establecidos en la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, según enmendada, 3 L.P.R.A. sec. 9671-977. De ordinario, esta tiene lugar luego de que se adjudican las controversias pendientes ante una agencia y concluyen todos los trámites administrativos. *Miranda Corrada v. DDEC et al.*, 211 DPR 738, 746 (2023).

Las determinaciones de las agencias administrativas son revisables ante el foro judicial para garantizar que estas actúan dentro de marco de las facultades que les fueron delegadas por ley. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* 213 DPR 743, 753 (2024); *OEG v. Martínez Giraud*, 210 DPR 79, 88 (2022). De esta manera, los ciudadanos tienen un foro al cual recurrir para vindicar sus derechos y obtener un remedio en los casos en que las agencias actúen de forma arbitraria. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, pág. 753. La revisión judicial de una decisión administrativa se circunscribe a examinar lo siguiente: 1) si el remedio concedido por la agencia fue el apropiado; 2) si las determinaciones de hecho realizadas por la agencia estuvieron sustentadas por la prueba sustancial que surgió del expediente administrativo; y 3) si, mediante una revisión completa y absoluta, las conclusiones de derecho fueron correctas. *Otero Rivera v. Bella Retail Group, Inc.* y otros, 2024 TSPR 70.

Cabe resaltar, que en el ejercicio de revisión judicial los tribunales no pueden descartar de forma absoluta la determinación de una agencia administrativa. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, pág. 754. Antes de variar la referida decisión se debe examinar la totalidad del expediente y "determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa, así fundamentado en la pericia particular de esta, en consideraciones de política pública o en la

apreciación de la prueba." *Íd*. A su vez, las decisiones administrativas se deben evaluar bajo el marco de la deferencia, por razón de la experiencia y pericia de dichas agencias respecto a las facultades que se le han delegado. *Batista, Nobbe v. JTA. Directores*, 185 DPR 206, 215 (2012),

En consideración a la aludida deferencia, se ha establecido que "las decisiones de las agencias administrativas tienen una presunción de legalidad y corrección que los tribunales deben respetar mientras que la parte que las impugna no produce suficiente evidencia para derrotarlas." *Batista, Nobbe v. JTA. Directores*, supra, pág. 215. A la luz de ello, la parte que impugne una decisión administrativa tiene el peso de la prueba para demostrar que esta no se sustenta en el expediente administrativo o que las conclusiones a las cuales llegó la agencia son irrazonables. *OEG v. Martínez Giraud*, supra, pág. 89.

**B. Ley de Ética Gubernamental**:

La Ley de Ética Gubernamental tiene el objetivo principal de dotar a la OEG de facultades preventivas y fiscalizadoras. Exposición de Motivos la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley Núm. 1-2012, según enmendada, 3 LPRA sec. 1854 et seq. De igual modo, su propósito se centra en la promoción de los valores de la confiabilidad, bondad, justicia, civismo, respeto y responsabilidad para lograr que los servidores públicos se desempeñen con honestidad, rigurosidad y eficiencia. *Id*. A la luz de dichos valores, la OEG penaliza a todos aquellos funcionarios públicos que trasgreden la normativa ética. *Id*. Con ello, la OEG busca evitar que se coloque en riesgo la estabilidad del soporte moral del Estado y que se vulnere la pureza de las responsabilidades atinentes al puesto del funcionario público. *Id*.

La OEG tiene la facultad de "[p]romover y formular las políticas y los programas de conducta ética y moral para los servidores públicos." 3 LPRA sec. 1855b; *Buxó Santiago v. Oficina de Ética Gubernamental*, 2024 TSPR 130. Dicha facultad se dirige a la consecución de varios objetivos, entre los cuales se destaca el eliminar del servicio público toda

práctica que resulte en ilegalidad, discriminación, fraude o de impericia administrativa. *Id.* En cuanto a la aplicabilidad de la referida legislación, ésta regula la conducta de los servidores y exservidores públicos de la Rama Ejecutiva. 3 LPRA sec. 1857. Para efectos de la precitada ley el concepto de servidor público se define de la siguiente forma:

> [P]ersona en el Gobierno que interviene en la formulación e implantación de la política pública o no, aunque desempeñe su encomienda permanente o temporalmente, con o sin remuneración. También, incluye al contratista independiente cuyo contrato equivale a un puesto o cargo, o que entre sus responsabilidades está la de intervenir directamente en la formulación e implantación de la política pública. 3 LPRA sec. 1854.

Para regular la conducta de dicho servidor público, la Ley de Ética Gubernamental establece en su artículo 4.2 una serie de prohibiciones éticas. En lo aquí concerniente, el inciso (q) del referido artículo lee como sigue: "Un servidor público, autorizado por ley para expedir certificaciones y otros documentos, no puede expedir como verdadera una certificación o un documento que contenga declaraciones que le consten que son falsas." 3 LPRA sec, 1857a. Al examinar el precitado inciso, surge que para constituirse debidamente una infracción ética deben concurrir los siguientes criterios: a) que se trate de un servidor público; b) que tenga autorización en ley para expedir una certificación o documento; c) que expedida una certificación o documento como verdadera; y d) que la referida certificación o documento contenga declaraciones que al servidor público le conste su falsedad.

Con relación al estándar probatorio requerido para fundamentar una infracción ética, el Tribunal Supremo, ha expresado que dicho estándar debe ser uno de prueba clara, robusta y convincente. *OEG v. Martínez Giraud*, supra, pág. 83-84. A pesar de que el aludido estándar probatorio no es susceptible de definición precisa, sí se describe que éste debe reunir "aquella evidencia que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables." *In re Rodríguez Mercado*, 165 DPR 630, 641 (2005). Además, se establece que dicho estándar es uno de naturaleza más sólida que el

estándar de preponderancia de la prueba, pero menos riguroso que la prueba más allá de toda duda razonable. *Id.* El criterio rector para este tipo de casos es de una prueba clara, robusta y convincente no afectada por reglas de exclusión y que descarte las conjeturas. *Id*, pág. 640.

**III**.

En esencia, la parte recurrente sostiene que la decisión de la OEG no cumple con las exigencias del quantum de prueba clara, robusta y convincente, requerido para este tipo de casos. A tenor de ello, aduce que la determinación recurrida está basada en conjeturas y suposiciones, dado que la realidad del caso es que existió un error de redacción que la parte recurrente por inadvertencia no pudo notar. Además, asevera que el referido error no tuvo ninguna consecuencia económica ni establece algún acto de corrupción. Por consiguiente, alega que la OEG actuó de manera arbitraria e irrazonable y que las multas impuestas son improcedentes.

Por su parte, la OEG sostiene la procedencia de las multas impuestas a tenor de los requisitos del Artículo 4.2(q), *supra*. Específica, que es un hecho estipulado que el señor Barlucea y la señora Pagán eran servidores públicos al momento de ocurrir los eventos que motivaron las querellas en cuestión. De igual modo, asevera que es un hecho estipulado que la parte recurrente suscribió el "*Informe de Viaje a España, Portugal y Marruecos,"* y que el señor Barlucea firmó la "*Certificación*" del año 2017. Además, aduce que la parte recurrente tenía autoridad para emitir los referidos documentos a tenor del "Reglamento de Gastos de Viaje y Bagaje de Funcionarios y Empleados Municipales en Gestiones Oficiales," Ordenanza Municipal Núm. 14 Serie 2005-2006, y del "Reglamento para la Administración Municipal," Reglamentó Núm. 7539 del 18 de julio de 2008. Asimismo, argumenta que el estándar probatorio de prueba clara, robusta y convincente se cumple en este caso, toda vez que la parte recurrente tenía conocimiento de la inexactitud de los documentos que suscribía.

Tras evaluar minuciosamente la totalidad del expediente y la copia de los expedientes administrativos ante nuestra consideración, determinamos *confirmar* la "*Resolución*" recurrida.

El texto del precitado artículo 4.2(q), *supra* es claro. Para que exista una infracción ética a la luz de sus disposiciones deben concurrir los siguientes requisitos: a) que se trate de un servidor público; b) que tenga autorización en ley para expedir una certificación o documento; c) que expida una certificación o documento como verdadera; y d) que la referida certificación o documento contenga declaraciones que al servidor público le conste su falsedad. El presente caso cumple con los referidos requisitos.

El señor Barlucea y la señora Pagán eran servidores públicos al momento de ocurrir los hechos que motivaron la querella. El señor Barlucea ocupaba el puesto de alcalde del Municipio de Adjuntas y la señora Pagán fungía como directora de Recursos Humanos del aludido municipio. A su vez, los referidos servidores públicos tenían el deber jurídico de rendir un informe escrito sobre sus gestiones oficiales en el exterior, al amparo de la sección 5ta del Reglamentó Núm. 7539, *supra.* Así lo hicieron. Es un hecho estipulado, que la parte recurrente cumplió con dicho deber al emitir y suscribir el "*Informe de Viaje a España, Portugal y Marruecos.*"

El referido informe fue firmado por la parte recurrente a solo ocho (8) días de haber regresado del viaje, por lo cual su memoria gozaba de mayor claridad y cercanía a los pormenores relacionados al aludido viaje. Surge de dicho informe que se incluyó al estudiante Barriera Bonilla entre las personas que viajaron cuando no existe controversia sobre que la parte recurrente conocía previo a la realización del viaje que el estudiante Barriera Bonilla no participaría de este. Por consiguiente, a la parte recurrente le constaba que el aludido informe adolecía de hechos incorrectos. Asimismo, no está en controversia que el señor Barlucea suscribió la "*Certificación*" del año 2017, mediante la cual reproduce la

misma información errónea contenida en el aludido informe, y certifica de manera expresa que ningún estudiante canceló el viaje.

Nótese, que le artículo 4.2(q) *supra* no requiere que exista un incumplimiento ético intencional. Solo basta que el servidor público conozca que las declaraciones contenidas en el documento o certificación no son acordes a la realidad. Las estipulaciones de las partes por sí solas fundamentan que las actuaciones de la parte recurrente constituyen una infracción ética al amparo del artículo 4.2(q), *supra*. Los argumentos de la parte recurrente no están dirigidos a negar que tenía conocimiento de la cancelación del viaje del estudiante Barriera Bonilla ni a impugnar la legitimidad de la documentación firmada. Mas bien, la parte recurrente se limita a levantar una defensa afirmativa que no reúne los elementos necesarios para constituir un error excusable.

Surge de la Ley de Ética Gubernamental, *supra* que los funcionarios públicos deben exhibir el valor de la responsabilidad para desempeñar su cargo con rigurosidad y eficiencia. A la luz de lo anterior, todo acto que ejecute un servidor público debe darse en el contexto de los valores que promueve la referida legislación. Por lo tanto, las firmas que los servidores públicos plasmen en alguna documentación o certificación no deben estar ajena a las cualidades de responsabilidad, rigurosidad y eficiencia, para evitar que se certifique como verdad hechos que carecen de veracidad. En vista de ello, todo servidor público debe leer cuidadosamente el documento en el que esboza su firma. Así pues, las defensas de error humano e inadvertencia levantadas por la parte recurrente no son suficientes para evadir las exigencias contempladas en el Artículo 4.2(q), *supra* y en la exposición de motivos plasmada en la Ley de Ética Gubernamental, *supra*.

Ante ello, no hay duda de que la OEG mostró evidencia que origina un convencimiento de que las infracciones éticas impuestas proceden a tenor del estándar probatorio de prueba clara, robusta y convincente. Toda vez que, no existe controversia sobre el conocimiento de la

cancelación del viaje del estudiante Barriera Bonilla y la firma de la documentación en cuestión. A su vez, las defensas afirmativas levantas son insuficientes. Así pues, a luz de la presunción de legalidad y corrección que reviste a las decisiones de las agencias administrativas y en vista de que la "*Resolución*" dictaminada se apoya en evidencia sustancial del expediente, procede necesariamente conceder nuestra deferencia a la determinación recurrida.

**IV.**

En virtud de lo expuesto, *confirmamos* la "*Resolución*" dictaminada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones